Harold CHRISTIANSEN, doing business as Palmer Christiansen Company, Plaintiff,

v.

MECHANICAL CONTRACTORS BID DEPOSITORY, a Utah Corporation, Defendant.

No. C 44-63.

United States District Court
D. Utah,
Central Division.

June 3, 1964.

Allan E. Mecham and A. Reed Reynolds, of Clyde, Mecham & Pratt, Salt Lake City, Utah, for plaintiff.

D. Howe Moffat and Grant Iverson, of Moffat, Iverson & Elggren, Salt Lake City, Utah, for defendant.

CHRISTENSEN, District Judge.

The plaintiff, a mechanical specialty contractor,[1] has sued the defendant, The Utah Mechanical Contractors Bid Depository,[2] for damages and injunctive relief in reliance upon the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2, and § 15. The members of the Depository comprise a majority of the mechanical contractors in the State of Utah, and receive most of the important mechanical contracts bid within the State. The controversy mainly involves the validity of rules under which general contractors obtain sub-bids through the Depository.

Detailed Findings of Fact and Conclusions of Law are being filed with this Memorandum Decision; they may be deemed supplemented by the views herein expressed. It is sufficient now to state only limited background for explanation and resolution of the legal questions presented.

The Depository was organized for the avowed purpose "to promote the principles of competitive free enterprise and

---

1. "Mechanical specialty contractors" generally furnish and install plumbing, heating, ventilating, air conditioning and related equipment as a part of building and construction contracts.

2. Often referred to as "the Depository".

to eliminate as far as possible unfair bidding practices. * * * " Among the practices against which relief was sought were those termed "bid shopping and bid peddling". Members submitted their bids to general contractors through the Depository under regulations which were designed to discourage direct negotiations for lower prices. General contractors accepting bids through the Depository were required to let these mechanical subcontracts to Depository members.[3] The latter restrictive provisions incorporated by amendment on November 12, 1962, together with certain other supplementing provisions, were unacceptable to the plaintiff, who had theretofore been a member and officer of the Depository. He thereupon discontinued his affiliation and later sued for damages to his business as a mechanical contractor.

Plaintiff claims that the rules in question are in restraint of trade and tend to create a monopoly. He further asserts that the administration of the Depository has been arbitrary and unfair, that opportunity has been afforded for collusion between bidders, with the result that general contractors do not necessarily secure the benefit of the lowest bids; that mechanical contractors can determine in advance who is bidding a particular project and that they have opportunity to tamper with the price or rig their bids, and that other abuses beyond the purport of the rules of the Depository have been perpetrated.

I have concluded that the latter contentions have not been sufficiently sustained, beyond the purport and expressed intent of the formal Depository rules themselves, to establish Sherman Act liability.[4] In fact, in some respects the administration of the rules was businesslike, circumspect and considerate. Evidence of minor abuses was sufficient to suggest that the Depository plan involved certain disadvantages even to members and was to a degree ineffectual to curb bid shopping and peddling, thus mitigating the necessity and reasonableness of the specific rules under attack. The rules themselves, however, constitute the agreement or combination in restraint of trade or in furtherance of monopoly upon which liability, if it exists, primarily must be founded. To their specific provisions we now turn.[5]

Under the rules and regulations of the defendant corporation, general contractors who desire mechanical bids from the Depository are required to request such bids at least forty-eight hours prior to the time set for bid openings. Rule V further provided:[6]

"It is to be explicitly understood that the depository will forward bids to general contractors making request therefor with the understanding that the general contractor will use only bids thus received from the depository in preparing his bid. * * * "

A form for required use by the general contractor in requesting bids from the Depository contains the following undertaking:

"We are familiar with the depository rules numbers five, six and seven (as revised on November 12,.

3. For a discussion of the merits of, and objections to, various Depository systems, see Schueller, "Bid Depositories", Vol. 58, Michigan Law Review, pp. 497–530 (Feb. 1960).

4. Cf. Las Vegas Merchant Plumbers Ass'n v. United States, 9th Cir., 210 F.2d 732 (1954); United States v. Northeast Texas Chapter, 5th Cir., 181 F.2d 30 (1950), and United States v. Heating, Piping & Air C. Contr. Ass'n, D.C.S.D.Cal., 33 F. Supp. 978 (1940).

5. The governing rules and regulations of the Bid Depository were first adopted and published on May 16, 1962, then amended on November 12, 1962 and again amended and republished on April 12, 1963; changes, not necessary to note here, were made at other times.

6. This rule in form was adopted by amendment on November 12, 1962. It was changed to less restrictive language on April 12, 1963, but the Depository continued to follow in general the November 1962 policy. (See footnote 15.)

1962) regarding the request for, and the acceptance of depository bids, and agree to comply therewith".

The rules of the Depository further provide:

"Any member, after a hearing, and who has been found by a majority of the committee to have failed to comply with the rules and regulations of the depository, may be assessed a sum not to exceed $300.00 for each specific violation. Also, upon recommendation by the committee he may be suspended from the depository, and further membership denied. General contractors found to have been engaged in unfair bidding practices, or rules violations, may only upon recommendation by the committee, continue to use the services of the depository as long as they comply with the rules and regulations of the depository".

Rule III provided as follows:

"All bids must be submitted on forms supplied by the depository. * * * It is the intent of the depository to provide complete mechanical quotations on all projects bid. Bid splitting such as plumbing only, heating only, etc. will not be acceptable".

Rule VIII (of the revision) provides:

"After bids for a specific project have been opened, there shall be no further bidding on said project for a period of 90 days, by members who did not submit bids in the first instance, unless plans and specifications have been revised in an amount exceeding 25% of the value of work and materials shown on the original plans and specifications".

Other provisions of the Depository rules are under attack. Apart from their support and implementation of Rules III, V and VIII quoted above, I do not think that they have exceptional antitrust implications. No ruling is made, however, as to their validity in other context.

I have concluded in view of established principles [7] that the three rules specifically referred to, representing as they do an agreement of the Depository with its members and the general contractors requesting Depository bids, implemented and activated, as the evidence shows they have been, by the concerted program of the Depository and its officers and committees, constitute a conspiratorial contract and combination in restraint of interstate commerce. They are thus proscribed by § 1 of the Sherman Act. I am also of the opinion that by means of the rules specifically referred to, the defendant corporation has attempted to monopolize, and has conspired with other persons to monopolize, a part of the commerce among the several states, contrary to § 2 of the Act.

The Depository argues that these restraints are reasonable and thus justified by a rule of reason.[8] I doubt that Rule V, as implemented by the required agreement on the part of general contractors bidding through the Depository, can be deemed anything but a per se vio-

7. Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed. 741 (1959); United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Fashion Originators' Guild v. Federal Trade Com'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377,

71 L.Ed. 700 (1927); Eastern States R. L. D. Asso. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); United States v. Insurance Board of Cleveland, D.C.N.D.Ohio, 188 F.Supp. 949 (1960); United States v. New Orleans Insurance Exchange, D.C.E.D.La., 148 F.Supp. 915 (1957). See also, Schueller, "Bid Depositories", Vol. 58, Michigan Law Review, pp. 497-530 (Feb. 1960).

8. Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

lation.[9] But standing alone, or in combination with the other provision of the integrated regulations, in my opinion this rule is restrictive of competition to an unreasonable degree and in an unreasonable manner.

The defendant corporation, we are told, was organized, and the regulations in question were designed, to cope with the "evils of bid shopping and bid peddling". These practices may be somewhat uncertain in definition [10] and the opprobrium they bear in the contracting fraternity and elsewhere may be excessive in substance [11] in view of basic competitive realities and standards.[12] Nonetheless, sound systems of competitive bidding no doubt are entitled to reasonable protection as a part of ordered competition. The difficulty in defendant's position is that even though the integrity of its bidding system were in practice assured by its rules and regulations, the system itself would still be an exclusionary one, resulting not primarily in the protection of competition but in its restraint.

The rules tend to compel general contractors to affiliate with the Depository because of economic pressure in obtaining representative bids and to boycott subcontractors not bidding through the Bid Depository. They further encourage mechanical subcontractors bidding through the Bid Depository to boycott general contractors who do not sign the Depository agreement. Also, they tend to limit and narrow the freedom of the general contractor to select his mechanical subcontractors. They preclude the subcontractors who have not submitted bids through the Bid Depository from submitting bids to those general contractors who sign a Depository agreement.[13]

Infractions of the Depository rules and regulations were to be submitted to a Fair Practice Committee composed of

9. See Fashion Originators' Guild v. Federal Trade Commission, supra.

10. For example, the defendant's expert, Professor Randa, said that "bid shopping" occurs when a bidder obtains information as to other bids submitted and then based on this information submits a lower bid. The report of the Committee on the Judiciary to the House of Representatives stated that if a general contractor initiates the activity the bid is said to be "shopped" because he is seeking to buy the mechanical specialty work at a price less than the previous bid. Professor Randa said that peddling is when a general contractor after being awarded the contract seeks to find a subcontractor who will perform the work for less than the lowest bid received prior to the opening. The Congressional Report indicates, on the contrary, that if the activity is initiated by a mechanical specialty contractor it is described as peddling the bid. This happens, we are told, where the subcontractor (usually one who did not submit a bid originally, or whose original bid was too high) attempts to sell his services after the contract has been awarded at a less price than bid.

11. Peddling competitive services and shopping for competitive undertakings do not seem generally incongruous with the accepted rule of competition in the market place.

12. The evidence disclosed that the expense of preparing a mechanical bid, whether accepted or not, is substantial. It is not just, argue defendants, that general contractors and other non-participant subcontractors should have the benefit of this initial processing through subsequent "bid shopping and peddling", involving those who have not gone to such expense. Yet competition in general essentially involves risking in various ways initial expenditures in the hope of being able to survive in a free market. And peddling competitive services and shopping for competitive propositions do not seem entirely incongruous in principle with accepted rules of competition.

13. For Example: A mechanical subcontractor testified that he found it necessary to join the Depository because he was unable to get his mechanical bids into the hands of the general contractors who distributed the bulk of the bids unless he did. Even after the operation of Rule V was formally suspended, he was cited before the Fair Practice Committee of the Depository and "suspended" for 90 days, with the understanding that the Depository would still distribute his bids "if I abided by the rules of the bid depository". Another mechanical contractor testified that in one instance after he was given to understand he was the low bidder, the general contractor gave

members of the corporation. Members were subject to fine, probation or expulsion from membership for violations. Infraction of the rules by a general contractor entailed possible disciplinary action by the Fair Practice Committee, notice of the infraction to be sent to the membership. This procedure has operated in the past, and is designed to operate essentially, as an implied blacklist, fostering boycott.[14]

■ The defendant points out that the restrictive form of Rule V was changed in April, 1963, so as not to preclude the letting of bids to non-depository members by general contractors initially requesting bids through the Depository. However, the evidence demonstrates, and I so find, that the Depository continued to carry out the original intent of Rule V, and that there was no actual abandonment of the conspiratorial agreement in this respect.[15] Indeed, continued observance of at least the spirt of Rule V seems the sine qua non of defendant's entire method and justification of controlling bidding through the Depository in an endeavor to "eliminate bid peddling and shopping".

The proscription of bid splitting in the context of the other controls, was a further restriction upon the essential free-

---

the subcontract to another because the witness was not a member of the Bid Depository; and in another case, while the general contractor gave him the subcontract as low bidder, a Depository member attempted to persuade him not to. Another general contractor would not receive a bid from him because he was not a Depository member. A general contractor testified that because he felt it necessary to request bids from the Depository, he rejected bids from non-depository members. He felt the rules were "morally binding and legally binding". Another general contractor testified that in order to be sure of getting representative bids it was necessary to join the Depository but that without being able to utilize non-depository bids, a contractor could not be sure of getting the low bid. Another general contractor testified that he felt he was "on a spot" when he had received an apparently low bid from a non-depository member and yet through acceptance of Depository bids also had agreed to be bound by the Depository rules. The plaintiff testified that not only in the latter instance, which is the disputed "Library Transaction" hereinafter discussed, but in at least two other known instances, contracts were awarded to Depository members despite his lower bids.

14. While there is no evidence of concerted blacklisting or boycotting in the sense charged in United States v. Heating, Piping & Air C. Contr. Ass'n, supra, the enforcement of the rule prohibiting the letting of bids by cooperating general contractors to non-depository members, through the publication of the names of non-cooperating members, generally proved adequate. Where there were de-

viations, offenders usually agreed not to repeat them. The library difficulty hereafter referred to is an example of the effectiveness of the controls, supported as they were not only by the officers of the defendant corporation but by a committee of general contractors.

15. The administrator or manager of the defendant corporation, even though minimizing the extent of the enforcement of Rule V, testified as follows:

"Mr. Mecham: Q. Well if a general contractor did not violate the [new] rules do you still think that the membership should be notified that he didn't use a Deposit member?

"A. I see nothing wrong with it.

"The Court: Mr. Hansen, I understand your answer when the rule was in effect to indicate that the only action as far as publicity that was taken by [against] a non-complying general contractor was to send notice to the membership that he wasn't using the Depository and that he let a bid to other than a Depository member. Is that the extent of publicity that you gave to a non-complying member when Rule V was in effect?

"The Witness: Yes.

"The Court: And you did the same thing after?

"The Witness: The same thing after.

"The Court: And how long did that policy and practice continue?

"The Witness: It continues to this day.

"The Court: So actually, even though Rule V isn't a rule, you take the same action by way of public notice to your members that you did when the rule was in effect.

"The Witness: We haven't changed that policy."

dom of competition. Mechanical contractors in a position to advantageously bid on one line could not do so because of the enforced tying arrangement imposed, not at the request of the general contractors soliciting the bids, but at the insistence of the Depository. A mechanical contractor operating under this rule was required to submit his bid covering all of the mechanical work even though part of it was outside the field in which he normally operated and in which he could most efficiently perform. The record indicates that this restriction has now been abandoned.

The prohibition of further bidding on a project for a period of ninety days by a member who does not submit bids in the first instance, unless plans and specifications have been revised in an amount exceeding twenty-five percent of the value of the work and materials shown on the original plans and specifications is a further competitive control not reasonably justified. Manifestly if the basic control of the Depository were to be accepted, some of the implementing features would be helpful. However, this provision does not seem to me to be inherently reasonable.[16] Even a reasonable implementation of unreasonable controls cannot be reasonably justified.

 Even though improper bid practices had developed in the industry, the situation would not justify the defendant company and its members in combining together to regulate and restrain interstate commerce in violation of federal law for the purpose of combatting recognized evils. Fashion Originators' Guild v. Federal Trade Com'n, supra. Good intent in and of itself is no defense to an unreasonable combination or conspiracy in restraint of trade. United States v. New Orleans Insurance Exchange, D.C.E.D.La., 148 F.Supp. 915 (1957). The notion has long been dispelled that restrictive by-laws should be treated as beyond the reach of the Sherman Act upon the claim of freedom of association. Associated Press v. United States, supra. The attempted elimination of what a trade association may justly regard as a trade abuse or an unfair practice cannot place an association in a preferred position with respect to unlawful agreements or combinations in restraint of trade.[17]

Were the latter propositions not valid, the thousands of active trade associations throughout the country could virtually ingest, absorb and eliminate the antitrust laws of the United States in their otherwise laudible programs of trade protection and industrial reform.[18] If the dangers of bid splitting and shopping are so serious as to commend a departure from the policy of the Sherman Act, Congress should authorize the exception. Thus far, although related proposals have been under study for several years, it has not done so. Under existing law there

16. The restriction is, in form, applicable only to "members", but because of the required commitments to the system by general contractors it has broader effect. This rule does not remotely relate to bid peddling or shopping, the claimed justification of the Depository. It is an advance renunciation of the right to compete by those who did not participate in the first bidding, and seems designed only to induce subcontractors to participate in the Depository procedures or to lose their chances for a possible rebid. The argument that it is costly to prepare bids in the first instance and that this cost should involve some special benefit or protection in favor of the original bidders seems at variance with some of the foundations of competitive bidding.

17. See Lamb & Kittelle, Trade Association Law and Practice (Trade Regulation Series, Chapter 10, ¶¶ 10.1 through 10.11, pp. 141–163).

18. Our ideas of what constitute illigitimate trade practices may have to be changed from time to time. Thus, a type of design copying assumed in Fashion Originators' Guild v. Federal Trade Comn., supra, to be tortuous was held in the late case of Compco Corp. v. Day-Brite Lighting, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) not to constitute tortuous or unfair competition at all, in view of the implications of the Patent Act.

are, of course, even some immediately salutary objects which trade associations are not empowered to achieve and some means which they, in common with less formal combinations, may not utilize.[19]

Various restrictive provisions for the promotion of common interests of association members and to regulate the conduct of their businesses have been upheld in the past as reasonable. Anderson v. U. S., 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300 (1898); Appalachian Coals v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); Board of Trade of City of Chicago v. United States, supra; United States v. Bakersfield Associated Plumbing Contractors, D.C.S.D.Cal.1958 (1958 Trade Cases ¶ 69,087 and 1959 Trade Cases ¶ 69,266).

The Supreme Court decisions last cited are not deemed controlling because of somewhat different states of fact [20] and because of later qualification of their doctrine implicit in Fashion Originators' Guild v. Federal Trade Com'n, supra. Prohibitions against bid splitting and rebidding were disapproved in United States v. Bakersfield Associated Plumbing Contractors, supra, and with this I agree. On the other hand, a rule somewhat resembling Rule V was approved. While the reasons do not clearly appear from the decision, there apparently were some significant differences which deprive the conclusions in the California decision of persuasive force here.[21]

█ The plaintiff enjoyed prior to the adoption of Rule V, a substantial part

---

19. "A trade association's most difficult problems probably arise when its members are faced with keen competition or when other forces, outside the industry or within it, threaten to undermine the industry's position. Either situation requires careful analysis of its causes before an association can decide what may be done *legally* to effect a remedy. Unethical practices on the part of some members of an industry may be alleviated through discussions at trade association meetings or through other persuasive, *but not coercive*, means. Terminating such practice may, however, require action by the enforcement agencies—the Department of Justice or the Federal Trade Commission. Relieving more serious economic distress may call for legislative remedies.

"Whatever the 'ill' a trade association and its members face, they must be guided by one basic principle. Neither the existence of abuses, even those that are unlawful practices, nor the threat of severe economic displacement, justifies remedies that themselves transgress the law." Lamb and Kittelle, Trade Association Law and Practice, Trade Regulation Series, pp. 152–153 (Little, Brown and Co., Boston: 1956).

20. Several distinctions are suggested in Fashion Originators' Guild, see p. 708 of 61 S.Ct.

21. Rule 7D of the Bakersfield Contract provided: "Bids addressed to the general contractors shall be available to the general contractors one hour following the

opening of bids addressed to the Depository; provided, however, that no bid shall be delivered to a general contractor until said contractor has agreed in writing to accept a bid if it is the bid accepted through the Depository." Rule V here reads in part: "It is to be explicitly understood that the Depository will forward bids to general contractors making request therefor with the understanding that the general contractor will use only bids thus received from the Depository in preparing the bid. It is also to be understood that any general contractor who has not made a request for bids from the Depository may solicit mechanical bids from any person or firm that he desires and that he is not obligated to use the Depository at all if he does not wish to do so. The Depository service will be available upon request from any general contractor on one or more of his jobs, without the general contractor thereby being committed or required in any way to use the service on other jobs." In the defendant's brief in the Bakersfield case reference is made to Rule 7D "which requires the general contractor to agree in writing to accept the low bid of the bids which he takes from the Depository". It was further argued in this brief that there was no evidence introduced to show that unless a general contractor takes his bid from the bid depository the members will boycott him. It was further argued that there was no provision in the Rule which requires a general contractor on any project to take his bids from the Depository. It was further urged that *the general contractor is at*

of the business awarded through the Depository on equal terms with other mechanical contractors. Because of his unwillingness to identify himself with the Depository following the adoption of Rule V, he was substantially excluded from the opportunity of competing in the business bid through the Depository by general contractors, who in turn were required generally to give their business to members of the Depository. In one sense the impact—and an adverse one— upon his business cannot be denied. But the proof in my judgment is insufficient to authorize the award of damages for general loss of profits. While it tended to establish, and I have found, that he would have made approximately $15,000 more through bids submitted through the Depository had it not been for the restrictive effect against his business of Rule V, yet the evidence also demonstrates that in the non-depository segment of the market in which he came to specialize, other competition was lessened through the operation of Rule V.

I cannot accept the theory of the defendant, assumed in Professor Randa's economic testimony, that plaintiff should be permitted to recover the general profits which he would have received through Depository bidding had he not been excluded therefrom with no consideration being given to increased profits obtained through non-depository bidding. His operations in both areas were integrated and commingled. It was established from plaintiff's income tax returns that his net earnings from mechanical specialty work during 1962 greatly exceeded his net income for the years 1960 and 1961 when the Depository was not in existence. The evidence further indicated that during the period Rule V was in effect plaintiff received a higher percentage of the total contracts awarded to Depository and non-depository bidders than he received during the eleven months of 1962 before Rule V was adopted. Plaintiff declined to give any estimate as to his income for 1963 (audited figures not being complete at the time of trial) but he did testify that according to his records he had his fair share of bids for 1963, "not in the Bid Depository, but all of the jobs".

Notwithstanding the proper liberality of the rule on proof of damages in antitrust cases when the fact of damage has been established, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Kobe, Inc. v. Dempsey Pump Co., 10th Cir., 198 F.2d 416 (1952), there is no room here for the application of that rule. One having a right of action for injury to his business or property cannot recover unless it is shown that as a result of defendant's acts damages in some amount susceptible of expression in figures resulted; damages must be proved by facts from which their existence is logically and legally inferrable, and cannot be supplied by conjecture. Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Damages to one's business or property from violations of the Sherman Act constitute the measure of any recovery, and the mere amount of illegal exactions does not establish pecuniary loss to a business or property when counterveiling elements are present. Clark Oil Co. v. Phillips Petroleum Co., D.C.D.Minn., 56 F. Supp. 569 (1944); aff'd, 8th Cir., 148 F.2d 580 (1945).

But as to special damages resulting from the application of Rule V, I have concluded that the preponderance of the evidence has established that plain-

---

liberty to shop around and select such subcontractors as he may desire. "If he is able to find a subcontractor who has not submitted a bid to the Depository who will bid to him a lesser amount than that which is in the Depository he is at liberty to accept such bid and not take any bids from the Depository. The only restriction is that if he does take a bid on a particular craft from the Depository he must use the low bid in the Depository on that craft." If this construction of the California rule is correct, it is relatively innocuous as compared to Rule V here.

tiff was unlawfully deprived of the mechanical contract for the Salt Lake City Library because he was not a member of the Depository and because in the implementation of Rule V the defendant brought pressure to bear upon Culp Construction Company to award the contract to a Depository member. I have further concluded that while the proof was not sufficient to authorize the award of damages for general loss of profits, recovery may be had for this special injury. The line between these classes of recovery may be fine, but to disregard it I believe would not be in recognition of any essential or sound rule on damages but in unwarranted minimization of the policy of Congress for enforcement aid through private suits. Cf. Osborn v. Sinclair Refining Company, 4th Cir., 324 F.2d 566 (1963), cert. dnd. 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed. 1255. Here the damage was proximate and direct, its impact clearcut, its effect non-speculative and its amount clearly provable. Nor is there any offsetting factors which are not themselves speculative or conjectural in contrast.

The plaintiff was the low bidder on the mechanical contract for the Salt Lake City Library. Culp Construction Company used plaintiff's bid in preparing its general bid to the owner. The bid solicited from the defendant Bid Depository and from the plaintiff on the Salt Lake City Library by Culp Construction Company called for a bid on the sprinkling system in connection with the plumbing, heating and air conditioning systems. Justin White, an officer of the defendant Bid Depository, with the assistance and cooperation of other officers of the defendant, split his bid on the Salt Lake City Library in such a manner as to withdraw the bid on the sprinkling system portion and to arrange for Culp Construction Company to contract directly for such sprinkling system work with the Southwest Fire and Protection Company so as to reduce the remaining portion of Justin White's bid below that of plaintiff.

It is true that plaintiff is in a position to object neither to the failure of the Depository to insist that bids be not split, nor to the splitting of the bid by White, for the regulation prohibiting bid splitting has been determined to be invalid. But this gambit does not avoid the fact that Culp awarded the contract to White as the proximate result of Rule V and the pressure brought to bear by officers and members of the Depository and certain general contractors upon Culp to refrain from awarding the bid to a non-depository member in violation of the rule.

Whether a conspiratorial agreement, or some other factor, was the proximate cause of the loss of this business is a question of fact for a determination from a preponderance of the evidence. Story Parchment Co. v. Patterson Parchment Paper Company et al., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). I have found that the combination bid of the plaintiff on the library job, which was invited in such combination by the Culp Construction Company, and which was submitted in combination by the plaintiff, would have been accepted had it not been for the enforcement of Rule V by the Depository, its officers, agents and others acting in concert with them. White's maneuver with respect to the splitting of his bid, again in an effort to implement the restrictions against non-depository bidders, does not alter the situation, for this was made effective by bringing in a new subcontractor after the bids were opened, and would not have been determinative had it not been for Rule V.

Culp's testimony that without reference to Rule V he probably would have awarded the bid to White as the low bidder after the sprinkling schedule was eliminated, is not persuasive in view of the circumstances of the transaction and his other testimony.[22]

---

22. Culp was originally a party defendant in this action and his testimony was to be weighed in view of his original interest in the case, although he generally appeared to be a candid witness. He testified that he called for a combination bid

■ There is no merit in defendant's argument that plaintiff is barred from recovery by reason of discriminating quotations to other bidders. It is true that Culp, originally a party defendant in this suit, was dismissed upon his contention that a recovery by plaintiff in effect would have amounted to the enforcement of a violation of the Robinson-Patman Act in that a company controlled by plaintiff gave plaintiff a quotation on the sprinkling system, incorporated in his bid, which was less than those given to White and other mechanical specialty bidders. Whether that ruling was right or wrong, I find nothing either in the proof or the argument now before me which indicates that the doctrine of Kentucky Rural Elec. Coop. Corp. v. Moloney Elec. Co., 6th Cir., 282 F.2d 481 (1960), could apply to Christiansen's claim against the Depository. The connection between the quotations of plaintiff's separate company and the defendant is remote rather than direct; we are concerned with sub-bids for labor and services in reference to a sprinkler system which possibly are not even touched by the Robinson-Patman Act, much less being within the rationale of the Kentucky Rural Electric case, supra; and any possible tenuous or indirect implications in this connection must yield to redress for the clear, direct impact of the established Sherman Act violation. See Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947).

Plaintiff claims that he was deprived of $33,250 in anticipated profits as a result of being deprived of the library job. I cannot accept this figure. It is based upon a profit factor included in plaintiff's initial bid as a mere hope, includes items of overhead, and disregards the data in evidence indicating a net profit of substantially less in actual practice.

■ Using a factor based more nearly upon plaintiff's probable net profits from actual operations, I have found his damages to be $20,000, to be trebled in accordance with the statute. I have further concluded that the plaintiff is entitled to be awarded his reasonable counsel fees and expenses and appropriate injunctive relief, which will be fixed and determined at the time the form of judgment is settled.

on all three sections of the mechanical work including the sprinkling system. He believed plaintiff was a competent contractor. He used plaintiff's bid in preparing his general bid to the owner. He never reduced his overall bid as a consequence of the subsequent acceptance of the separate sprinkler bid. He testified, among other things "Well, as I said, after we had sent our general bid in my office manager brought to my attention that we had signed this receipt from the Depository which stated that we were to use only Depository bidders in the preparation of our bid. Since we hadn't used Depository members in the preparation of our bid, but we had used Palmer Christiansen and as we had signed the receipt, we felt we were in a spot". Thereafter Justin White, who then was an officer of the Depository, contacted him. Because of the questions he raised,

Culp submitted the matter to the Ethical Practice Committee of the Associated General Contractors, of which he was a member, and agreed that he would abide by their decision. Representatives of the Depository, including White, met with this Committee. White urged the committee to award the contract to him because of the Depository rule. The committee thereafter ruled in his favor. And ironically enough, the separate sprinkler bid on which White relied for his claim that taking this into consideration he was the low bidder on the balance, had not been available to Culp at the time the bidding was closed, although reportedly in the Depository. In this sense the subequent consideration of the new sprinkler bid was the result of "bid peddling", so condemned in other context by the Depository.