[S.F. No. 22763. In Bank. Mar. 23, 1971.]

OAKLAND-ALAMEDA COUNTY BUILDERS' EXCHANGE et al.,
Plaintiffs and Appellants, v.
F. P. LATHROP CONSTRUCTION COMPANY,
Defendant and Respondent.

**356**

## COUNSEL

MacDonald, Brunsell & Walters and William Walters for Plaintiffs and Appellants.

Robert J. Foley, Foley, McIntosh & Foley, Foley, Saler & Doutt, William H. Orrick, Jr., and Orrick, Herrington, Rowley & Sutcliffe for Defendant and Respondent.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and Wallace Howland, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**MOSK, J.**—Plaintiffs appeal from a judgment on the pleadings rendered in favor of defendant in their action for declaratory relief and damages for breach of the rules of a bid depository. We here determine whether certain of the rules of the bid depository constitute per se violations of the antitrust law of California.

Bid depositories are creations of the construction industry, generally established by construction trades subcontractors to control the process of submitting subbids to general contractors who are bidding on large

construction jobs. The operation of a typical bid depository is succinctly described by a commentator as follows: "A 'locked box' procedure is the most common method of depository operation. Subcontractors wishing to bid to one or more general contractors on a certain job submit bids in sealed envelopes to the depository. An envelope containing a bid addressed to each general contractor to whom the subcontractor wishes to bid is placed in the 'locked box,' and another envelope containing a copy of that bid is addressed to the depository itself and similarly deposited in the box or another secure receptacle. There will be a cut-off point, typically 4 hours or so before the prime bid opening time (*i.e.,* the time by which all bids must be submitted to the owner or awarding authority), and after that cut-off point (or depository closing time) is reached, no more bids may be received, and none received may be amended or withdrawn.

"Promptly at the depository closing time, the locked box is opened, and the envelopes contained therein are dispensed to the general contractors to whom addressed. Each general contractor then prepares his own bid to the owner or awarding authority based upon subbids received and his estimates of his own work costs." (Orrick, *Trade Associations Are Boycott-Prone—Bid Depositories As A Case Study* (1968) 19 Hastings L.J. 505, 520.)

The "locked box" operation is said to serve several salutary purposes. It permits orderly preparation of bids and estimates by providing a reasonable time for computations, and thereby reduces error. Also, it tends to prevent "bid piracy" which occurs when one subcontractor is able to avoid the expense of preparing his own bid by using the bid submitted by another subcontractor as a starting vehicle. Most importantly, it inhibits practices known variously as "bid shopping," "bid peddling," and "bid chiseling." These pejorative expressions appear to be used interchangeably to describe (1) the practice of a general contractor who, before the award of the prime contract, discloses to interested subcontractors the current low subbids on certain subcontracts in an effort to obtain lower subbids, (2) the identical practice of a general contractor engaged in after he has been awarded the prime contract, and (3) the practice of a subcontractor who determines the currently low subbid on a subcontract and then submits a lower bid to the general contractor in return for assurance from the general that the sub will receive the subcontract if the general is the successful prime bidder. (*Id.* at pp. 520-521; Schueller, *Bid Depositories* (1960) 58 Mich.L.Rev. 497, 498 and fn. 6, 499-500.)[1]

---

[1]Some authorities draw precise distinctions among the several expressions. "Bid chiseling" is limited to the practice of a general contractor who solicits lower sub-bids

Plaintiffs in the instant action are the Oakland-Alameda County Builders' Exchange, which operates a "locked box" bid depository (Depository), and two subcontractors. Defendant is a general contractor. On March 1, 1966, defendant received bids from various subcontractors to be used by it in computing its prime bid for the construction of an auditorium at Chabot College. Most of the subbids received by defendant were submitted through the Depository. Defendant was awarded the construction contract, and it proceeded to award the various subcontracts on the basis of the bids received.

Plaintiff subcontractors had submitted their bids for the painting and floor covering work through the Depository, and their bids were the lowest placed through the Depository in their respective trade categories. Nevertheless, defendant did not accept the two bids because it had received lower painting and floor covering figures from two other subcontractors who had not submitted their offers through the Depository. As a consequence, defendant rejected the bids of plaintiff subcontractors and accepted the lower bids.

The Builders' Exchange and the two subcontractors brought suit against defendant, alleging that defendant had breached the rules of the Depository to which it had subscribed and that plaintiff subcontractors were entitled to damages. Defendant answered, admitted the rules of the Depository and its violation of them, but alleged that the rules were unenforceable because they constituted per se violations of the Cartwright Act, Business and Professions Code sections 16720, subdivisions (a) and (e)(4), and 16726.[2] The trial court agreed with defendant's contention and granted judgment on the pleadings to defendant on that basis.

The specific rules of the Oakland-Alameda Bid Depository which de-

---

after he has been awarded the prime contract. "Bid shopping" is used to refer to such solicitation by general contractors before the award of the prime contract. And "bid peddling" applies to the conduct of a subcontractor. (See *People* v. *Inland Bid Depository* (1965) 233 Cal.App.2d 851, 863-864 [44 Cal.Rptr. 206]; Comment (1970) 18 U.C.L.A. L.Rev. 389, 394.)

[2]Section 16720: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: (a) To create or carry out restrictions in trade or commerce. . . . (e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any combination of any of the following: . . . (4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any . . . article or commodity, that its price might in any manner be affected."

Section 16726: "Except as provided in this chapter, every trust is unlawful, against public policy and void."

fendant and the Attorney General of California, by amicus curiae brief, contend are in violation of Business and Professions Code sections 16720 and 16726 are the following:

Rule 4. "All bids submitted through the Bid Depository shall be actually delivered to the Bid Custodian by mail, or in person, or otherwise, as follows. . . ." The rule then sets forth a chart which establishes the Depository closing time as four hours prior to the prime opening time, when the prime bid opening time is between 1 p.m. and 5 p.m. on a business day. When the prime bid opening time is between 9 a.m. and 12 noon, the Depository closing time is 4 p.m. on the working day immediately previous.

Rule 6a. "Any subcontractor or supplier desiring to submit a bid to any person or persons through the Bid Depository shall submit to the Bid Depository a separate and sealed bid addressed to each general contractor to whom the subcontractor or supplier desires to bid and shall file with the Bid Custodian in a separate and sealed envelope addressed to the Bid Depository an identical copy of each such bid filed by him. b. Any general contractor who has received or solicited a bid direct from a subcontractor in a particular craft or supplier in a particular classification upon any project and who desires to use the facilities of the Bid Depository upon that project for receiving competitive bids in that craft or classification, shall submit to the Bid Depository such bid in a separate and sealed envelope addressed to the general contractor and shall file with the Bid Custodian in a separate and sealed envelope addressed to the Bid Depository an identical copy of each such bid filed by him. . . ."

Rule 7. "Immediately upon receipt of any bid for a specified project it shall be deposited in a Bid Depository box in which sealed bids can be deposited but not removed when locked. The Bid Depository box for each project shall be locked upon deposit of the first bid deposited therein and shall be kept locked until the time for depositing bids upon that project as specified in Rule 4 hereof has expired."

Rule 8a. "Any bid deposited with the Bid Depository may be revoked by the person submitting the same at any time prior to the expiration of the time for depositing bids upon the project involved as specified in Rule 4 hereof. . . . b. Any bid delivered to a general contractor as in these Rules provided, shall be deemed an irrevocable offer to such contractor and may not be revoked thereafter without such general contractor's consent for a period of thirty (30) days from the date of delivery to the general contractor . . . unless, prior to general bid opening . . . [t]he subcontractor or supplier

gives notice to all general contractors to whom he has bid of a substantial mistake. . . . *d.* In the event of bids submitted in combination, any segregated portion of the bid may be withdrawn as provided under Rule 8 without jeopardizing or invalidating other segregated portions of the bid. However, in addition to the segregated portion withdrawn, any combination containing the item withdrawn must likewise be withdrawn."

Rule 9*a.* "The sealed envelopes containing bids addressed to the general contractors shall be made available for delivery to the person or persons to whom addressed as soon as practicable after the expiration of the time for depositing bids upon the project involved as specified in Rule 4 hereof, provided, however, that the general contractor may refuse to accept any envelope containing the bid of a subcontractor with whom he does not desire to contract . . . or the general contractor may reject the bid of any subcontractor with whom he does not desire to contract . . . by immediately returning to the Bid Custodian, unopened, the envelope containing the bid of such subcontractor. . . . *c.* If a general contractor elects to receive delivery through the Bid Depository of one or more bids for a craft or classification, he shall be obligated, and he hereby agrees, that if he is the successful prime bidder and receives an award of the general contract, he will award the contract for this particular craft or classification to the lowest bidder whose bid he receives through the Bid Depository. . . . *e.* No sealed bid shall be delivered to a general contractor by the Bid Depository except in accordance with these Rules and until the general contractor shall have executed the general contractor's bid acceptance form provided by the Bid Depository. Such form shall require the general contractor to abide by the Rules of the Bid Depository as to the particular project."

The defendant and the Attorney General contend that these rules, singularly and in combination, are per se violations of the Cartwright Act because they create (1) a combination of participating subcontractors and general contractors to restrain open price competition among subcontractors, (2) a group boycott by participating general contractors against nonparticipating subcontractors, and (3) a group boycott by participating subcontractors against nonparticipating general contractors. They assert that the illegality of the Depository rules may be established, first, by reference to general principles of antitrust law applicable in California and the federal courts and, second, by reference to three appellate decisions concerned specifically with the antitrust implications of bid depositories. We conclude that the contentions are meritorious and, therefore, we affirm the trial court's judgment.

■ At the outset, it may be helpful to review the concept of per se

illegality under antitrust law as aptly summarized in a recent Court of Appeal opinion: "In response to the attempts of antitrust defendants to justify every restrictive combination on the ground that, in the light of all the economic facts and conditions, the particular practice assailed was reasonable, the federal cases have developed a doctrine of so-called 'per se' violations, i.e., acts which are held to be prohibited by the antitrust laws regardless of any asserted justification or alleged reasonableness. [citation]. Although for convenience and brevity, the courts have used the 'illegal per se' terminology, an analysis indicates that it does not denote an arbitrary rigid classification, but rather encompasses certain practices that normally tend to eliminate competition. As the United States Supreme Court recently stated in *Northern Pac. Ry. Co.* v. *United States,* 356 U.S. 1 [2 L.Ed.2d 545, 78 S.Ct. 514]: 'The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition.' (P. 4 [2 L.Ed.2d at p. 549].)

" 'However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, [citation]; division of markets, [citation]; group boycotts, [citation]; and tying arrangements, [citation].' (P. 5 [2 L.Ed.2d at pp. 549-550].)

"The 'per se' doctrine means that a particular practice and the setting in which it occurs is sufficient to compel the conclusion that competition is unreasonably restrained and the practice is consequently illegal." (*People*

v. *Santa Clara Valley Bowling etc. Assn.* (1965) 238 Cal.App.2d 225, 233-234 [47 Cal.Rptr. 570].) (Fn. omitted.)[3]

The first contention of the defendant and the Attorney General is that the Oakland-Alameda Bid Depository is a combination of subcontractors with the purpose and effect of restraining open price competition among subcontractors. We agree.

Plaintiffs' complaint states that the purpose of the Depository was to inhibit " 'bid peddling' which refers to the disclosure, for the purpose of obtaining a more favorable bid, by a general contractor of one subcontrator's bid to a competing subcontractor prior to award, and the practice of 'bid shopping' which refers to such disclosure for the same purpose after an award has been made to a general contractor." Plaintiffs contend that defendant engaged in "bid peddling" by soliciting lower subbids outside the Depository for the floor covering and painting work.[4] Instead of being a vice, however, it is readily apparent that the practice defined as "bid peddling" is illustrative of open price competition in its purest form. To the extent that general contractors disclose the lowest subbids to competing subcontractors and thereby induce the subcontractors to make still lower subbids, the general contractors are able to offer lower prime bids to the awarding authority. The awarding authority, the taxpayers in the case of public projects and consumers in other instances, are the true beneficiaries. To obtain the lowest possible bid is the object of competitive bidding.

Rules 4, 6, 7, 8, and 9 of the Bid Depository combine to create a system of bidding virtually devoid of open price competition. The subbids are sealed so that no subcontractor is aware of the bids of his competitors; the subbids are not made available to the general contractors until after the deadline for the submission of further subbids; subcontractors may not withdraw or revoke their bids after the deadline for submission of subbids

---

[3]Because the Cartwright Act is patterned after the federal Sherman Act and both have their roots in the common law, federal cases interpreting the Sherman Act are applicable in construing the Cartwright Act. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481].)

[4]There is no contention that defendant engaged in the practice defined in the complaint as "bid shopping." Although also a form of price competition, bid shopping is less desirable than bid peddling because only the general contractor, and not the awarding authority or the public, benefits from this practice. Post-award bid shopping is prohibited in California on public works construction projects by Government Code section 4104, which requires general contractors, at the time they submit their prime bids, to list the names of the subcontractors whose bids were accepted in the computation of their prime bids. Thus, general contractors are not free to solicit lower subbids once they have been awarded the prime contract. (See Comment (1970) *supra*, 18 U.C.L.A. L.Rev. 389, 396, 402-404.)

except in the case of mistake, and any withdrawal of a bid is penalized by the requirement that combination bids containing an item withdrawn must also be withdrawn; general contractors using the Depository to receive any subbids are compelled to accept the lowest bid submitted through the Depository. Thus, neither general contractors nor interested subcontractors who use the Depository are able to exercise initiative to instigate open price competition among subcontractors and by that means to stimulate lower subbids. If a general contractor believes the subbids he has received through the Depository are too high, he must nevertheless accept the lowest of them or withdraw from the bidding on the prime contract. In essence, the rules constitute an agreement by subscribing subcontractors not to engage in open price competition in the submission of their bids to general contractors and an agreement by participating general contractors not to deal with subcontractors who do not cooperate.

Under both California and federal law, agreements fixing or tampering with prices are illegal per se. The principle was stated clearly by the United States Supreme Court: "[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. . . . Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The [Sherman] Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference." (*U.S.* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150, 218, 221 [84 L.Ed. 1129, 1165, 1167, 60 S.Ct. 811].)

In *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 44 [172 P.2d 867], we delineated a similar policy underlying the Cartwright Act: "The Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law. . . . The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity, but upon the interplay of the economic forces of supply and demand." (See also *People* v. *Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719, 727 [264 P.2d 31].) It should be apparent that the "economic forces of supply and demand" can have little impact on a bidding system which is conducted in secrecy and which leaves general

contractors no alternative but to accept the lowest bids submitted through the Depository or withdraw from the bidding.[5]

Relying on *Socony,* a federal circuit court invalidated a price-fixing scheme similar in its purpose and effect to the rules of the Depository. In *United States* v. *Gasoline Retailers Association, Inc.* (7th Cir. 1961) 285 F.2d 688, an agreement among gas station operators not to advertise their retail prices for gasoline was invalidated as a price-fixing conspiracy. The court recognized that the purpose and effect of the agreement was to reduce open price competition among the operators, and was unimpressed with the operators' avowed intent of preventing the competitive evil of "gas wars." In the instant action, participants in the Depository impose a rule of silence no less stifling to open price competition than the agreement not to advertise, and they do so in the guise of preventing the competitive evil of "bid peddling." As in *Gasoline Retailers,* the sellers (subcontractors) agree not to publicize their prices (bids), and the buyers (general contractors) are deprived of the benefit of purchasing at the lowest price available in a free enterprise system of open price competition.

■ Related to the general charge that the rules of the Depository restrain open price competition and unlawfully tamper with the pricing structure is the more specific assertion that rule 9c, in the context of the other rules, necessarily results in agreements by general contractors to boycott subcontractors whose bids are not processed through the Depository. Rule 9c requires a general contractor, who "elects to receive delivery through the Bid Depository of one or more bids for a craft or classification," to agree that, "if he is the successful prime bidder," he will award the contract in the particular classification "to the lowest bidder *whose bid he receives through the Bid Depository.*" (Italics added.)

The unmistakable impact of rule 9c upon subcontractors who do not submit their bids through the Depository directly, or indirectly under rule 6b, is that they are boycotted by participating general contractors who are not permitted to accept such bids even when they are the lowest submitted in a particular classification. A general contractor who wishes to receive any bids through the Depository in a particular classification must promise to accept only bids submitted through the Depository in that classification; general contractors must use the Depository exclusively or

---

[5]In the system of bidding between general contractors and the awarding authority, the latter always has available the means by which it can increase competition among general contractors and arrive at lower prime bids. If, fortuitously or by collusion, all of the prime bids submitted on a particular project are too high, the awarding authority may simply reject all of them and reopen bidding on the project.

not at all. Thus, rule 9c is the means by which subcontractors who have agreed not to engage in open price competition enforce their methods against uncooperative subcontractors.

We need not belabor the obvious in noting that group boycotts are illegal per se under traditional antitrust principles. As stated by the United States Supreme Court in *Klor's* v. *Broadway-Hale Stores* (1959) 359 U.S. 207 [3 L.Ed.2d 741, 79 S.Ct. 705], at page 212 [3 L.Ed.2d at p. 744]: "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality.' [Citations.] Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court said in *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U.S. 211, 213 [95 L.Ed. 219, 223, 71 S.Ct. 259], 'such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' " (Fn. omitted.)

Plaintiffs respond that the provisions of rule 6b, which permit a general contractor to receive bids outside the Depository if he then submits them to the Depository, cure any illegal boycott effect of rule 9c. The contention is specious. Despite rule 6b, general contractors, must, as a condition precedent to receiving any bids through the Depository, agree to accept only those bids submitted through the Depository. In other words, general contractors must promise not to deal with subcontractors who refuse to abide by the Depository rules designed to restrain open price competition. All that rule 6b accomplishes is to reduce the number of outside subcontractors with whom a general contractor must refuse to deal under rule 9c by the number of subbids which he has timely deposited under rule 6b.

The third contention made by defendant and the Attorney General is that rule 6a results in a boycott by participating subcontractors of all general contractors who do not use the Depository. Analysis of the language of the rule would seem to justify their apprehension. Any subcontractor who proposes to submit a bid through the Depository "to any person" must submit to the Depository sealed bids addressed "to each general contractor to whom the subcontractor . . . desires to bid." Because the group of general contractors "to whom the subcontractor desires to bid" may embrace some general contractors who do not use the Depository as well as those who do, the effect of rule 6a is to require subcontractors using the Depository to submit to it all of the bids they desire to make on a particular

job. Thus, no subcontractor using the Depository for one or more bids may bid to a general contractor except through the Depository. Although plaintiffs deny that the Depository rules involve any boycott by subcontractors against nonparticipating general contractors, they do not deal specifically with the language of rule 6a or offer a rational alternative interpretation.

The foregoing analysis of the provisions of the Depository rules in light of the established principles of antitrust law against price-fixing and group boycotts and in favor of free competition clearly justifies the conclusion reached by the trial court that the rules are illegal per se. However, we do not rely exclusively on our independent analysis of the Depository rules, nor do we here follow an uncharted course, for similar rules have been invalidated in persuasively reasoned opinions of other courts.

In *Christiansen* v. *Mechanical Contractors Bid Depository* (D.C. Utah 1964) 230 F.Supp. 186, affirmed (10th Cir. 1965) 352 F.2d 817, certiorari denied (1966) 384 U.S. 918 [16 L.Ed.2d 439, 86 S.Ct. 1365], the federal courts reflected upon organizational features of bid depositories. In rendering judgment in favor of a dissident subcontractor and against a bid depository, the district court specifically considered and invalidated three rules of the bid depository. Although two of the rules concerned matters not relevant to the instant action, the third (rule V) was the precise counterpart of rule 9c of the Oakland-Alameda Bid Depository and required subscribing general contractors to use only bids submitted through the depository in preparing their prime bids. The district court stated: "The Depository argues that these restraints are reasonable and thus justified by a rule of reason. I doubt that Rule V, as implemented by the required agreement on the part of general contractors bidding through the Depository, can be deemed anything but a per se violation. But standing alone, or in combination with the other provision of the integrated regulations, in my opinion this rule is restrictive of competition to an unreasonable degree and in an unreasonable manner. . . . The rules tend to compel general contractors to affiliate with the Depository because of economic pressure in obtaining representative bids and to boycott subcontractors not bidding through the Bid Depository. They further encourage mechanical subcontractors bidding through the Bid Depository to boycott general contractors who do not sign the Depository Agreement. Also, they tend to limit and narrow the freedom of the general contractor to select his mechanical subcontractors." (230 F.Supp. at pp. 189-190.) (Fns. omitted.)[6]

---

[6]Despite this unequivocal language, the circuit court, in affirming the district court's decision, sought to limit the holding: "It was suggested that Rule V alone constituted

Appellants seek to avoid the devastating impact of *Christiansen* by attempting to distinguish the case. They contend that the district court in *Christiansen* heard evidence and found actual economic pressure on general contractors to boycott nondepositing subcontractors and other abusive practices, while in the instant case the trial court rendered judgment on the pleadings based on the depository rules alone. But the *Christiansen* court explicitly declared that its judgment was based solely on the illegality of the rules themselves: It "concluded that the latter contentions [of specific coercive practices and other abuses "beyond the purport of the rules"] have not been sufficiently sustained, beyond the purport and expressed intent of the formal Depository rules themselves, to establish Sherman Act liability. . . . The rules themselves, however, constitute the agreement or combination in restraint of trade or in furtherance of monopoly upon which liability, if it exists, primarily must be founded." (230 F.Supp. at p. 188.) (Fn. omitted.)

It is also suggested that *Christiansen* may be distinguished because use of the depository in that case was restricted to subcontractors who were members of the depository. Therefore, the argument runs, the requirement that the general contractor use the bid of a member served to boycott subcontractors who were not members of the depository. While this may be a minor factual difference from the case at bar, it is of no significance in evaluating the essential rule. The only requirement for "membership" in the depository in *Christiansen* was that the prospective member be a contractor in a subtrade serviced by the depository—in other words, a subcontractor. Membership in the *Christiansen* bid depository denoted nothing more than that a subcontractor agreed to abide by depository rules, precisely as participating subcontractors did in the instant case. Here, the group of nonusing subcontractors who are boycotted under rule 9c is identical to the group of nonmember subcontractors boycotted in *Christiansen*.

*People* v. *Inland Bid Depository, supra,* 233 Cal.App.2d 851, followed *Christiansen* and provides California precedent in support of the trial court judgment. Reasonably read, *Inland Bid* constitutes persuasive support for the views of the defendant and the Attorney General in the instant case. The Court of Appeal there affirmed the trial court's determination that depository rules similar to rule 9c and rule 6a were illegal per se under the

a *per se* violation of Section 1; however, since the decision was based on the combined effect of Rules V, III and VIII, and their implementation, we need not determine whether a *per se* violation occurred." (352 F.2d at p. 819, fn. 5.)

Cartwright Act.[7] In addition, the court invalidated a rule identical to rule 4, establishing a four-hour bid depository closing time.

The third in the line of significant authorities is *Carl N. Swenson Co.* v. *E. C. Braun Co.* (1969) 272 Cal.App.2d 366 [77 Cal.Rptr. 378]. In that case, plaintiff general contractor sued defendant subcontractor for breach of depository rules when the defendant withdrew its bid after the expiration of the period authorized by the rules. Plaintiff conceded that depository rules identical to rules 4 and 9c were invalid under *Christiansen* and *Inland Bid,* but it argued that only the rules restricting the right of subcontractors to withdraw their bids after the bid depository closing time were directly involved in its appeal. The Court of Appeal agreed, but it held that the withdrawal rules were also illegal per se because they prevented subcontractors from competitively lowering their bids during the period just before the general bid opening time and they required withdrawal of combination bids. The withdrawal rules invalidated in *Swenson* were virtually identical to the provisions in rule 8, subdivisions b and d, of the Oakland-Alameda Bid Depository. Viewed with *Christiansen* and *Inland Bid, Swenson* is the third in a consistent line of cases in support of the trial court's judgment on the pleadings in the case at bar.

Plaintiffs rely on *Associated Plumbing Contractors of Marin etc. Counties, Inc.* v. *F. W. Spencer & Son, Inc.* (1963) 213 Cal.App.2d 1 [28 Cal.Rptr. 425] and *United States* v. *Bakersfield Associated Plumbing Contractors, Inc.* (S.D. Cal. 1958) 1958 Trade Cases, par. 69087, 1959 Trade Cases, par. 69266. Reliance on *Spencer* is entirely misplaced because the case is easily distinguishable from the instant case and from *Christiansen, Inland Bid,* and *Swenson.* An earlier case than any of the foregoing, *Spencer* concerned only the practice of post-award bid shopping and validated depository rules which prohibited that practice. Furthermore, it is not evident that the depository rules in *Spencer* required general contractors to accept the lowest bids submitted through the depository. To the extent that the language of the case or its general approach to the problem of the antitrust implications of bid depositories is inconsistent with the views we express herein, it is disapproved. The still earlier *Bakersfield* case, a district court decision, is distinguished in *Christiansen* (230 F.Supp. at fn. 21, pp. 193-194) and *Inland Bid* (233 Cal.App.2d at p. 858) on the basis

---

[7]Referring to the rule requiring general contractors to accept the lowest bid submitted through the depository, the Court of Appeal stated: "To require the general contractor to employ the lowest bid under 8B, at a time when he had seen no other subbids, would be detrimental to the public, leading to collusion by the subcontractors and ruinous to the construction industry." (233 Cal.App.2d at pp. 859-860.)

of asserted factual differences among the rules involved and, in any event, is unpersuasive.

We conclude that the rules of the Oakland-Alameda County Bid Depository impose requirements upon participating subcontractors and general contractors which involve illegal price tampering and group boycotts. Therefore the judgment of the trial court is affirmed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.