# 2000 DTA 157

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL DE BAYAMON**

EL PUEBLO DE PUERTO RICO
Peticionario

v.

ALFREDO COTTO DIAZ
Imputado-Recurrido

Núm. KLCE-99-01032

San Juan, Puerto Rico, a 20 de junio de 2000

Panel integrado por su Presidente, el Juez Gierbolini,
la Juez Hernández Torres y el Juez Cordero

Gilberto Gierbolini, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El Pueblo de Puerto Rico (Pueblo), representado por el Procurador General de Puerto Rico, comparece ante nuestra consideración mediante recurso de *Certiorari* y solicita que revoquemos la determinación emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 30 de agosto de 1999. En esa fecha, el Foro de Primera Instancia en una vista preliminar en alzada, concluyó que no existía causa probable para acusar a Alfredo Cotto Díaz (Cotto Díaz) por infringir los Artículos 401 ██ y 406 ██ de la Ley de Sustancias Controladas, 24 L.P.R.A. Secciones 2401 y 2406.

Por los fundamentos que expresaremos a continuación, procedemos a EXPEDIR el auto solicitado y CONFIRMAR la determinación recurrida.

### I

Contra Cotto Díaz, el Ministerio Público presentó denuncias por infracción a los Artículos 401 y 406 de la Ley de Sustancias Controladas, *supra*. En dichas denuncias, el Ministerio Público alegó que:

*"El referido imputado, ALFREDO COTTO DIAZ C/P ALFRED, allá en o para el 20 de noviembre de 1998, en Bayamón, ilegal, voluntaria, maliciosa, a sabiendas y con la intención criminal, actuando en concierto y común acuerdo con Erick Joel Salas Bonilla C/P Canito y Ricardo García C/P Bola o Gordo, DISTRIBUYO la sustancia controlada conocida por cocaína al venderle a un agente encubierto del NIE un (1) kilo al precio de $16,000.*

*El referido imputado, ALFREDO COTTO DIAZ C/P ALFRED, allá en o para el 20 de noviembre de 1998, en Bayamón, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de Bayamón, ilegal, voluntaria, maliciosa, a sabiendas y con la intención criminal, actuando en concierto y común acuerdo con Erick Joel Salas Bonilla C/P Canito y Ricardo García C/P Bola o Gordo, CONSPIRO para distribuir, como distribuyó, la sustancia controlada conocida como cocaína, al venderle a un agente encubierto del NIE un (1) kilo de dicha sustancia al precio de $16,000."*

La vista preliminar contra Cotto Díaz fue celebrada el 20 de julio de 1999. En la misma, el Tribunal de Primera Instancia determinó que no había causa probable para acusar al imputado. El Ministerio Público, en corte abierta, anunció que recurriría en vista preliminar en alzada. Ante las intenciones del Ministerio Público, la defensa de Cotto Díaz anunció que levantaría una defensa de coartada. (Transcripción, página 2).

La vista preliminar en alzada comenzó el 12 de agosto de 1999. Antes de que los procedimientos iniciaran, surgió una controversia entre las partes acerca de la notificación por escrito, tanto de la petición de vista preliminar en alzada como de la defensa de coartada. (Transcripción, páginas 2-4). La defensa de Cotto Díaz alegó que no había cumplido con el requisito establecido en la Regla 74 de Procedimiento Criminal, 34 L.P.R.A.

Apéndice IV, toda vez que no había recibido copia de la petición de vista preliminar en alzada presentada el 6 de agosto de 1999 por el Ministerio Público. (Transcripción, página 4). El Tribunal recurrido, luego de considerar los planteamientos de las partes, determinó que le daría tiempo suficiente al Ministerio Público para que realizara su investigación, luego de escuchar la prueba de cargo, y que la defensa de Cotto Díaz cumpliera con la notificación reglamentaria sobre la coartada. (Transcripción, páginas 4-5).

Acto seguido, el Ministerio Público presentó como primer testigo de cargo al Agente Pedro Ortiz Franqui (Agente Ortiz) adscrito a la División para Combatir el Crimen Organizado del Negociado de Investigaciones Especiales del Departamento de Justicia. El Agente Ortiz estuvo a cargo de la investigación y del operativo que condujo al arresto de Cotto Díaz. (Transcripción, página 12). A preguntas del Ministerio Público, el Agente Ortiz relató que el 19 de noviembre de 1998, una persona no identificada lo llamó y le informó que un individuo conocido por Canito había hablado con él sobre unas personas que tenían un kilo de cocaína que pensaban vender en $16,000.00. (Transcripción, página 13). El 20 de noviembre de 1998, el confidente le comunicó al Agente Ortiz que esa noche sería efectuada la transacción en el Supermercado Amigo de la Avenida Santa Juanita en Bayamón, cerca a un establecimiento comercial denominado como *"Sweet Girl"*. (Transcripción, páginas 13-14). A eso de las 7:30 PM, el Agente Ortiz, su supervisor, el Agente Jesús Marrero, el Agente Freddie Santiago y el Agente encubierto José Feliciano *("Agente Feliciano")*, acudieron al lugar donde la transacción sería realizada. (Transcripción, página 14). El Agente Feliciano adoptó la identidad de *"Iván Lagarde"*, un narcotraficante de Aibonito que interesaba comprar el kilo de droga. (Transcripción, página 15). Este llegó al lugar acordado en un vehículo Mitsubishi Diamante. (Transcripción, página 21).

Los Agentes Marrero y Santiago estuvieron destacados dentro del negocio *"Sweet Girl"* en labores de vigilancia. (Transcripción, página 16). Mientras la transacción tomaba forma, los Agentes Antonio Calafell, María Cortés y Orlando Rivera ejercieron igual función cerca del vehículo donde llegó Feliciano. (Transcripción, página 16). El Agente Ortiz, y los Agentes Rafael Rosado, Rubén Claudio y Roberto Ortiz tenían la encomienda de vigilar y tomar video de la transacción, de ser posible. (Transcripción, página 17). Estos últimos estaban en una guagua ubicada a una distancia de aproximadamente seis automóviles desde el lugar de la transacción. (Transcripción, página 20).

Durante la transacción, el Agente Ortiz pudo observar que Erick Joel Salas Bonilla (Canito) estacionó su vehículo al lado del automóvil del Agente Feliciano. (Transcripción, página 20). Simultáneamente, llegó un vehículo marca Kia. (Transcripción, página 20). El agente Feliciano, Canito y el confidente fueron a la parte posterior del vehículo del primero. (Transcripción, páginas 20-21). De inmediato, una persona obesa bajó del Kia y acudió a donde estaban el Agente Feliciano. Canito y el confidente. (Transcripción, página 21). Esta persona momentáneamente regresó al Kia y de nuevo fue a la parte trasera del vehículo del Agente Feliciano. (Transcripción, página 21). El Agente Ortiz vio la figura de una persona delgada que estuvo todo el tiempo en el asiento del conductor del vehículo Kia, pero no pudo identificarla porque los cristales del mencionado vehículo tenían tintes ahumados obscuros, lo que le impidió una mejor visibilidad. (Transcripción, páginas 19-20, 24). Posteriormente, la persona que había abandonado el Kia regresa al mencionado vehículo, el cual, de inmediato, inicia su marcha hacia el Supermercado Amigo. (Transcripción, página 21). A preguntas de la defensa, el Agente Ortiz admitió no haber observado la transacción. (Transcripción, página 35). El Agente Ortiz declaró que la transacción no pudo ser filmada, ya que los cristales de la parte frontal de la guagua utilizada en el operativo no eran ahumados y precisamente en esa dirección el negocio fue consumado. (Transcripción, página 17). Los agentes tampoco tomaron fotos de la transacción. (Transcripción, página 37). Resulta pertinente destacar que la tablilla del vehículo Kia utilizado en la transacción no fue investigada por los agentes. (Transcripción, páginas 47-48).

El segundo testigo presentado por el Ministerio Público fue el Agente Feliciano. Este relató que a eso de las 8:00 PM del 20 de noviembre de 1998 acudió al lugar donde sería realizada la transacción. (Transcripción, página 58). Al llegar al lugar, estaba esperándolo el confidente y ambos entraron al negocio *"Sweet Girl"*. (Transcripción, página 59). Luego llegó Canito, esperaron varios minutos y los tres salieron en ruta al lugar donde la transacción sería efectuada. (Transcripción, páginas 60-61). El Agente Feliciano divisa el vehículo Kia y

observó dos siluetas dentro del mismo: un hombre delgado, el conductor, y uno grueso, el pasajero. (Transcripción, página 61). A preguntas del Ministerio Público, el Agente Feliciano relató que los cristales del vehículo Kia estaban subidos, y que los mismos eran ahumados por lo que lo único que podía ver eran dos siluetas. (Transcripción, página 62). El Agente Feliciano narró que al acercarse a la parte frontal del vehículo Kia observó que el conductor del mismo era Cotto Díaz. (Transcripción, páginas 63, 66). Luego, el Agente Feliciano va a la parte posterior de su automóvil, la persona gruesa, que identifica como Ricardo García, *"Bola"*, lo sigue. (Transcripción páginas 63-64). Bola abrió su camisa y de la misma sacó un paquete rectangular y lo depositó en el baúl del vehículo del Agente Feliciano, quien procedió a examinar si en efecto era el kilo objeto del negocio. (Transcripción, página 64). El Agente Feliciano le dio a Bola los $16,000.00. (Transcripción, página 64). Según el relato del Agente Feliciano, Bola fue al vehículo Kia y le dio el dinero a Cotto Díaz. (Transcripción, página 64). Acto seguido, Bola volvió al lado del Agente Feliciano y alegadamente Cotto Díaz le preguntó cuánto dinero le habían entregado. (Transcripción, página 64). Después Bola subió al automóvil Kia que de inmediato inició su marcha hacia el Supermercado Amigo. (Transcripción, página 64).

A preguntas del Ministerio Público, el Agente Feliciano narró que durante la transacción, Bola había dejado abierta la puerta del vehículo Kia y pudo observar de costado a Cotto Díaz, quien alegadamente estaba vestido con una camisa color naranja y mahones azules cortos. (Transcripción, página 67). Según el Agente Feliciano, la noche de la transacción Cotto Díaz tenía el cabello largo tipo blow, con un *"rabito"* y tenía un bigote tipo candado. (Transcripción, página 65). Acto seguido, el Agente Feliciano identifica a Cotto Díaz en sala y describe que había cambiado su recorte y estaba afeitado. (Transcripción, página 65).

El Agente Feliciano dijo que no era la primera vez que veía a Cotto Díaz, puesto que había presenciado su participación en programas de television, carátulas de discos, en revistas y bailes. (Transcripción, página 66). Finalmente, el Agente Feliciano describió que la sustancia le fue entregada al Agente Claudio para que fuera custodiada. (Transcripción, página 69).

Durante el contrainterrogatorio de la defensa, el Agente Feliciano aceptó que en la declaración jurada que había prestado ante el Ministerio Público, había omitido decir que Cotto Díaz tenía un *"rabito"* en el pelo, y que el color de su cabello era negro. (Transcripción, páginas 76-77). La defensa de Cotto Díaz confrontó al Agente Feliciano con una declaración jurada que éste había prestado y en la cual había descrito que la noche de la transacción Cotto Díaz tenía bigote, pero en ningún momento dijo que era una *"sombra"* tipo *"candado"*. (Transcripción, páginas 80-81). El Agente Feliciano también aceptó haber omitido en la declaración jurada que Cotto Díaz en un momento preguntó cuanto dinero le habían entregado. (Transcripción, página 90). También aceptó que el lugar de la transacción estaba obscuro. (Transcripción, página 95).

A preguntas del Juez que presidió la vista, el Agente Feliciano indicó que había comenzado a trabajar en la investigación del caso, que hoy nos ocupa, a escasos cuatro días de la transacción y que en el ínterin el Agente Ortiz le había comunicado que Cotto Díaz era una de las posibles *"tarjetas"* de la investigación, pero no sabía que el imputado participaría en la transacción que inició el proceso penal que nos ocupa. (Transcripción, páginas 97-99). El Agente Feliciano pudo identificar a Cotto Díaz mediante su participación en actividades públicas, carátulas, televisión, pero no pudo hacer lo mismo con los demás integrantes del conjunto musical *"Grupomanía"* al que pertenece el imputado. (Transcripción, página 97).

El tercer testigo del Ministerio Público fue el Agente Claudio. Su testimonio estuvo limitado a corroborar la cadena de custodia del material ocupado y las pruebas de campo realizadas. (Transcripción, páginas 101-110). De acuerdo al testimonio del Agente Claudio, el material ocupado dio positivo a la sustancia controlada denominada como *"cocaína"*. (Transcripción, página 105).

Posteriormente, el Ministerio Público dio por sometido el caso. Sin embargo, el Tribunal llamó a declarar a Canito. (Transcripción, página 111). Este relató que estuvo al lado de Bola y el Agente Feliciano cuando realizaron el canje en el baúl del automóvil del último. (Transcripción, página 115). A preguntas del Ministerio Público, Canito aceptó que nunca pudo ver la persona que conducía el vehículo Kia. (Transcripción, página 115).

Canito narró que un amigo suyo llamado *"Levi"*, le había pedido un kilo de cocaína para ser vendido la noche del 20 de noviembre a alguien de Aibonito. (Transcripción, página 117). Entonces Canito fue donde Bola para que consiguiera la sustancia controlada. (Transcripción, página 117). Bola le indicó que lo esperara el día de los hechos a las 7:30 PM frente al negocio *"Sweet Girl"*. (Transcripción, páginas 117-118). A preguntas del Ministerio Público, Canito indicó que desconocía quién le suplía el material a Bola. (Transcripción, página 120).

La noche en que la transacción tomó lugar, Canito llegó al negocio *"Sweet Girl"* y posteriormente vio que Bola llegó con otra persona abordo de un vehículo marca Kia. (Transcripción, página 121). El testigo describió que los cristales del automóvil eran ahumados y lo único que pudo ver en ese momento fueron dos siluetas. (Transcripción, página 122). Posteriormente, Canito expresó que desconocía si entre Bola y Cotto Díaz existía algún tipo de relación. (Transcripción, página 126). Un día antes de la transacción, Bola y Canito habían acordado que una vez terminada la misma, el segundo recogería al primero en un lugar determinado para pagarle su parte. (Transcripción, página 127). Sin embargo, consumado el negocio, Bola lo esperó sólo en el lugar acordado y le pidió que lo llevara a casa de una hermana. (Transcripción, página 127).

Luego de que el Tribunal examinara a Canito, la defensa de Cotto Díaz anunció que presentaría evidencia de coartada. (Transcripción, página 134). Entonces, el Juez que presidió los procedimientos preguntó al Ministerio Público cuánto tiempo necesitaba para su preparación. (Transcripción, página 134). El Ministerio Público respondió que todo dependía de cuándo la defensa cumpliera con la Regla 74 de Procedimiento Criminal, *supra*, y que a partir de ese momento necesitaría 10 días. (Transcripción, página 134). Posteriormente, la defensa expresó que al día siguiente cumpliría con la notificación escrita requerida en la Regla 74, *supra*. La defensa anunció que la coartada consistiría en que Cotto Díaz, al momento de la transacción que le imputaban, estaba en medio de una obra de teatro en el Centro de Bellas Artes de Guaynabo. (Transcripción, página 135). Además, la defensa anunció que utilizaría como testigos a varias personas que participaron en dicha función, unas fotos que demuestran que Cotto Díaz estaba presente y un video que evidenciaba, con fecha y hora, la participación del imputado en la obra. (Transcripción, páginas 135-142). Al finalizar la sesión de ese día, el Juez que presidía la Sala preguntó al Ministerio Público si la continuación de los trabajos podría ser el 1 de septiembre de 1999 a lo que el Ministerio Público contestó que prefería una fecha más cercana, ya que para el 31 de agosto empezaba un juicio en Caguas. (Transcripción, página 145). Finalmente quedó pautado que los trabajos continuarían el lunes, 30 de agosto de 1999.

El 19 de agosto de 1999, el Ministerio Público presentó ante el Tribunal de Primera Instancia *"Moción Informativa y Solicitud de Orden"*. En dicha moción informó que el 13 de agosto de 1999, la defensa de Cotto Díaz había cumplido con lo establecido en la Regla 74 de Procedimiento Criminal, *supra*. El Ministerio Público añadió que el 18 de agosto de 1999 le fueron suministradas una serie de fotografías y partes de un video casero que la defensa iba a utilizar para probar su defensa de coartada. Con relación a los testigos de la defensa, los mismos serían entrevistados el 26 de agosto de 1999 en la Fiscalía de Bayamón. El Tribunal de Primera Instancia, a solicitud del Ministerio Público, ordenó a la defensa poner a su disposición: (1) los negativos de las fotos que le habían sido suministradas; (2) la totalidad del original del video cassette que pretendía utilizar; (3) las cámaras con que fueron tomadas las fotografías y el video. Todos éstos con el propósito de determinar, mediante examen pericial, si el material fílmico había sido alterado.

Así las cosas, el 26 de agosto de 1999, el Ministerio Público presentó una moción informativa ante el Tribunal de Primera Instancia en la que expresó que no fue hasta ese día que la defensa puso a su disposición los originales de las fotos y que el perito del Estado no estaba disponible para hacer las pruebas hasta el 31 de agosto de 1999.

Además, el Ministerio Público expresó que todavía faltaban por investigar varios puntos relacionados a la defensa de coartada levantada por Cotto Díaz y entrevistar a varias personas que pudieran guardar relación con los hechos del caso. Por estas razones, el Ministerio Público solicitó al Foro de Primera Instancia que extendiera, por lo menos cinco días adicionales, la continuación de la vista preliminar en alzada para terminar su preparación.

No obstante lo solicitado por el Ministerio Público, el 30 de agosto de 1999 continuaron los procedimientos. La defensa pidió que fueran identificadas varias fotos que luego procederían a autenticar. (Transcripción, página 150). El primer testigo llamado a declarar fue Antonio Ramos Ríos (Ramos). Ramos fue el productor de la obra *"Hace Rato Llegó el Apocalipsis al Barrio"* que estuvo en escena los días 19, 20, 21 y 22 de noviembre de 1998 en el Centro de Bellas Artes de Guaynabo. (Transcripción, páginas 152, 168). A preguntas de la defensa, Ramos relató que la obra fue protagonizada por los componentes del conjunto musical *"Grupomanía"*. (Transcripción, página 153). Específicamente el 20 de noviembre de 1999 Ramos llegó al Centro de Bellas Artes a las 6:00 P.M. (Transcripción, página 155). Aproximadamente a las 6:15 PM, Ramos reunió a todo el elenco para ensayar y fue la primera vez que vio a Cotto Díaz. (Transcripción, páginas 155-156). Luego, todos los actores fueron a sus respectivos camerinos y Ramos los visitó continuamente, cada cinco a diez minutos. (Transcripción, páginas 156, 177). A las 7:00 PM fue la primera llamada para que los actores salieran a escena. (Transcripción, página 157). Como a las 8:10 PM fue la segunda. (Transcripción, página 158). La tercera llamada fue a las 8:20 P.M. (Transcripción, página 159). Para ese momento todos los actores tenían que estar listos en la parte trasera del telón. (Transcripción, página 159). Hasta que la obra comenzara, los actores no podían abandonar ese lugar. (Transcripción, página 165). En el primer acto, los componentes de *"Grupomanía"* debían estar en una mesa en el escenario justo detrás del telón. (Transcripción, páginas 159-160).

Ramos describió que esa noche Cotto Díaz tenía el cabello corto y que tenía muy poco bigote. (Transcripción páginas 161-162). Sin embargo, a preguntas del Ministerio Público Ramos aceptó no recordar si Cotto Díaz en aquella noche tenía bellos en la cara descritos como un *"candaito incipiente"*. *(Transcripción, página 185)*. La vestimenta que Cotto Díaz utilizó en la obra era camisa y pantalón elegante, *"semi sport"*. *(Transcripción, página 162)*. Acto seguido, la defensa le enseña a Ramos una foto que identifica como la escenografía de la obra. (Transcripción, página 163). Luego, a Ramos le enseñan varias fotos en las cuales está Cotto Díaz actuando junto a otras personas. (Transcripción páginas 164-165). Las fotografías que Ramos había identificado fueron admitidas en evidencia. (Transcripción, página 186).

El segundo testigo de la defensa lo fue Armando Pargo González (Pargo). Pargo fue el director de la obra *"Hace Rato Llegó El Apocalipsis al Barrio"*. (Transcripción, página 187). El 20 de noviembre de 1998 Pargo llegó al Centro de Bellas Artes a las 6:00 P.M. (Transcripción, página 188). De inmediato pasó por los camerinos de los actores y vio a Cotto Díaz junto con los demás integrantes de *"Grupomanía"*. (Transcripción páginas 188, 189). A eso de las 6:00 PM, Pargo reunió a todo el elenco y allí estuvo presente Cotto Díaz. (Transcripción, página 190). La reunión duró aproximadamente media hora. (Transcripción, página 190). Luego, varios estudiantes que participaron en la obra realizaron una parodia de la misma que duró aproximadamente media hora y en la cual Cotto Díaz estuvo presente. (Transcripción, página 191). Pargo corroboró que a eso de las 8:20 PM del 20 de noviembre de 1999 al ser realizada la tercera llamada, Cotto Díaz estaba tras bastidores listo para salir a escena. (Transcripción, página 193). Posteriormente, la defensa mostró a Pargo varias de las fotos admitidas en evidencia y le pregunta si en las fotos Cotto Díaz tenía la misma apariencia que en la noche del 20 de noviembre de 1998. (Transcripción, página 195). Pargo respondió en la afirmativa. (Transcripción, página 195). Posteriormente, a preguntas del Ministerio Público en su turno de contrainterrogatorio, Pargo narró que las fotos que le había presentado la defensa fueron tomadas el 20 de noviembre de 1998. (Transcripción, página 196).

Finalmente, la defensa presentó como testigo a Celinés Pagán González (Pagán). Pagán fue la protagonista de la obra en la cual participó Cotto Díaz. La testigo declaró que el 20 de noviembre de 1998 llegó al Centro de Bellas Artes de Guaynabo a las 5:30 P.M.. (Transcripción, página 203). Ese día, por casualidad, arribó al mismo tiempo que Cotto Díaz. (Transcripción, página 203). A las 7:00 PM, fue celebrada la reunión del elenco y luego los extras de la obra realizaron una parodia de la misma. (Transcripción, página 204). Esto duró una hora. (Transcripción, páginas 204-205). A las 8:00 PM, Pagán y Héctor Serrano, otro de los integrantes de *"Grupomanía"*, ensayaron una canción que era parte de la obra. (Transcripción, página 205). Durante el ensayo de la canción, Cotto Díaz comenzó a cantar con Pagán y Héctor Serrano. (Transcripción, página 205). Esto sucedió entre 8:00 PM y 8:10 P.M. (Transcripción, página 205). En ese momento dieron la primera llamada y cada diez minutos dieron la segunda y tercera. (Transcripción, página 205). De acuerdo al testimonio de Pagán, esa noche su sobrino le tomó una foto detrás del telón con Cotto Díaz y al instante dieron la tercera llamada.

(Transcripción, página 205). Pagán aseguró que la foto fue tomada el 20 de noviembre de 1998 a las 8:20 P.M. (Transcripción, página 206). Esto, porque recordó que el día anterior fue efectuada una función y ella había olvidado la cámara. (Transcripción, página 206).

Cuando dieron la tercera llamada, todos los actores y actrices fueron a sus posiciones detrás del escenario. (Transcripción, página 206). Debido a que en esos días había estado lloviendo, le dieron una oportunidad a la gente para que entrara al Centro de Bellas Artes. (Transcripción, página 207). Por esta razón la obra comenzó con quince minutos de retraso, es decir, a las 8:45 P.M. (Transcripción, página 207). Desde que dieron la tercera llamada hasta que comenzó la obra, Pagán afirmó que Cotto Díaz en todo momento estuvo en su posición dentro del escenario. (Transcripción, página 207). La testigo narró que luego de comenzar la obra, nadie podía salir y que en efecto a todos los actores les fue requerido que siempre llegaran al Centro de Bellas Artes dos horas antes del comienzo de cada función. (Transcripción, página 208). Durante el contrainterrogatorio, el Ministerio Público le mostró una foto a Pagán quien afirmó que la misma fue tomada casi al final de la obra. (Transcripción, página 209). Esto, debido a que tenía la vestimenta que normalmente utilizaba al final del espectáculo. (Transcripción, página 209).

Luego de concluido el testimonio de Pagán, la defensa de Cotto Díaz, puso a disposición del Ministerio Público a sus testigos Jorge Gelpí, Magda Morales, Catherine Saavedra, Rey Fonseca, Geovanna Vega Carrión, un video tomado entre la tarde y noche del 20 de noviembre y otra cinta tomada antes de esa fecha en la cual alegadamente podía ser apreciado que Cotto Díaz, ya para el 20 de noviembre de 1998, tenía el pelo corto. (Transcripción, página 212). Luego de este ofrecimiento, el Juez que presidió los procedimientos preguntó al Ministerio Público si había prueba de refutación. (Transcripción, páginas 212-213). En específico, si alguno de los testigos que había entrevistado indicaron que Cotto Díaz no estuvo en el Centro de Bellas Artes de Guaynabo durante la obra. (Transcripción, página 213). El Ministerio Público contestó que todos los testigos le relataron básicamente lo mismo que ya los demás habían narrado ante el Tribunal y que su intervención estuvo limitada a escuchar sus relatos sin hacer preguntas. (Transcripción, páginas 214, 215). Finalmente, el Ministerio Público argumentó que la única prueba de refutación dependía de que el Tribunal, en el ejercicio de su discreción, diera oportunidad, según le había sido solicitado, para que el video alegadamente tomado el día de los hechos, fuera sometido a pruebas periciales con el propósito de determinar su autenticidad. (Transcripción, páginas 215-216).

Ante el planteamiento del Ministerio Público, el Tribunal determinó que la defensa no había sometido en evidencia el video en controversia. (Transcripción, página 216). El Foro de Primera Instancia expresó que el video y las fotografías son prueba para corroborar los testimonios. (Transcripción, página 217). Además, el Tribunal recurrido expresó que aun cuando el video hubiera sido alterado, ello no demuestra que los testigos mintieron y ello no hace inaplicable la defensa de coartada. (Transcripción, página 218). El Tribunal concluyó que no tomaría en consideración el video para tomar su determinación. (Transcripción, página 218). Al finalizar la vista, el Juez que presidió los procedimientos expresó que daba entera credibilidad a los testigos de coartada y que dicha prueba no fue refutada. (Transcripción, página 219). De acuerdo al Tribunal de Primera Instancia quedó establecido que Cotto Díaz estuvo en el Centro de Bellas Artes de Guaynabo desde la 6:15 PM del 20 de noviembre de 1998, hasta que finalizó la obra en la cual participó como actor. (Transcripción, página 220).

Al tomar su decisión, el Tribunal de Primera Instancia también consideró que existieron varias incongruencias en la prueba de cargo, tales como: (1) no tener disponible un vehículo que permitiera grabar una transacción de esta magnitud; (2) porqué los agentes estacionaron la guagua que utilizaron a una distancia tan lejana del lugar del negocio y que ésta fuera una de las excusas para no grabar el mismo; (3) no haber investigado la tablilla del vehículo Kia que fue utilizado; (4) luego de la transacción, nadie siguió el vehículo antes mencionado; (5) los agentes perdieron $16,000.00 del Gobierno de Puerto Rico; (6) la identificación del Agente Feliciano no fue confiable, toda vez que éste sólo llevaba cuatro días adscrito a la investigación y que al saber que una de las *"tarjetas"* era Cotto Díaz, tenía la expectativa de que esa era la persona que realizaría la transacción; (7) que el Agente Feliciano no pudo identificar a todos los integrantes del *"Grupomanía"* y, sin embargo, a Cotto Díaz sí, a pesar de que dijo conocía todos los miembros de dicha agrupación; (8) que la identificación que hizo el Agente Feliciano, duró escasos segundos y que en la declaración jurada prestada por éste describió a Cotto Díaz de

manera distinta a como lo hizo en sala. (Transcripción, páginas 220-224).

Inconforme con esta determinación, el 24 de septiembre de 1999, el Pueblo de Puerto Rico, representado por el Procurador General, acude ante nuestra consideración mediante recurso de *certiorari*. En dicho recurso, el Procurador General imputó al Tribunal de Primera Instancia que erró: (1) al permitirle a la defensa presentar evidencia de coartada en la vista preliminar sin antes haberse notificado al Ministerio Público tal defensa y cumplir con lo dispuesto en la Regla 74 de las Reglas de Procedimiento Criminal, *supra*; (2) al limitar irrazonablemente las oportunidades del Ministerio Público de refutar la evidencia de coartada de la defensa; (3) erró el Tribunal de Primera Instancia al asumir un rol más activo que el que permite nuestro sistema acusatorio adversativo.

El 4 de octubre de 1999, Cotto Díaz solicitó la desestimación del recurso presentado ante nuestra consideración por falta de jurisdicción. En síntesis, Cotto Díaz alegó que nuestro ordenamiento jurídico no permite que una determinación de no causa hecha por un magistrado competente, pueda ser revisada. El 4 de octubre de 1999, Cotto Díaz presentó escrito de *"Oposición al Recurso de Certiorari"*. Finalmente, la Secretaría del Tribunal de Primera Instancia nos remitió la transcripción de la vista el 3 de diciembre de 1999.

## II
En primer lugar, debemos determinar si tenemos jurisdicción para considerar el recurso que nos ocupa.

El Artículo 4.002 de la Ley Número 1 del 28 de julio de 1994, Ley de la Judicatura de 1994, según enmendada, 4 L.P.R.A. Sección 22 (k), Inciso (f), confiere a este Tribunal facultad para conocer:

*"Mediante auto de certiorari expedido a su discreción, de cualquier otra resolución u orden dictada por el Tribunal de Primera Instancia, incluyendo el Tribunal de Distrito durante el proceso de su abolición. En estos casos, el recurso de certiorari se formalizará presentando una solicitud dentro de los treinta (30) días siguientes a la fecha de notificación de la resolución u orden."*

Asimismo, el Artículo 671 del Código de Enjuiciamiento Civil, 32 L.P.R.A. Sección 3492, dispone que:

*"El Tribunal Supremo y el Tribunal de Circuito de Apelaciones quedan por la presente autorizados y con facultad para expedir autos de certiorari, únicamente bajo los términos y situaciones dispuestas en las secciones 22 a 23 n del Título 4; Ley de la Judicatura de Puerto Rico de 1994, y en las Reglas de Procedimiento Civil, Criminal y de Asuntos de Menores."*

Ahora bien, debemos analizar las disposiciones antes citadas, a la luz de lo resuelto por el Tribunal Supremo de Puerto Rico en *Pueblo v. Tribunal Superior*, 95 D.P.R. 412, 413-414 (1967); *Pueblo v. Opio Opio*, 104 D.P.R. 165, 171 (1975); y *Pueblo v. Cruz Justiniano*, 116 D.P.R. 28, 30-31 (1984). En el primero de los casos citados, el Tribunal Supremo de Puerto Rico estableció que la determinación de no causa en vista preliminar no es revisable mediante *certiorari*. El Tribunal Supremo interpretó que los magistrados del Tribunal de Primera Instancia actuaban en su capacidad individual en el ejercicio de sus funciones y facultad para determinar la existencia de causa probable para acusar. Por ende, sus determinaciones al efecto no eran decisiones de un tribunal. Allí quedó establecido que el auto de *certiorari* es expedido por un tribunal superior para revisar los procedimientos de otro tribunal inferior, pero no para revisar las determinaciones de un magistrado sobre la existencia de causa probable en ausencia de ley que así lo autorice. *Pueblo v. Tribunal Superior, supra*, página 413.

En *Pueblo v. Opio Opio, supra*, a la página 171, el Tribunal Supremo de Puerto Rico expresó que el magistrado de instancia, al hacer una determinación de no causa en vista preliminar en alzada, actúa como juez. Sin embargo, dicho Foro reafirmó su determinación anterior respecto a que la decisión en vista preliminar en alzada no es revisable mediante *certiorari*, ya que la misma está enmarcada dentro de un procedimiento especialmente regulado que tiene una finalidad esencial dentro del ordenado y rápido curso del procedimiento criminal. Evidentemente, dicha norma obedece a la preocupación de velar porque el derecho a juicio rápido se

cumpla con la máxima escrupulosidad posible y el propósito de la vista preliminar es salvaguardar el derecho fundamental de todo imputado a sentirse libre de la opresión y la preocupación que genera este tipo de procedimiento. *Id.*, página 169.

Finalmente, la norma prevaleciente está expuesta en *Pueblo v. Cruz Justiniano, supra,* a la páginas 30-31, en donde el Tribunal Supremo aclaró que es la determinación en los méritos sobre la existencia de causa probable la que no es revisable. No obstante, cualquier otra determinación estrictamente de derecho sí puede ser revisada mediante el recurso de *certiorari*. Véase, *Pueblo v. Rivera Alicea,* ___ D.P.R. ___ (2000), **2000 J.T.S. 54,** a la página 833; *Pueblo v. Colón Mendoza,* ___ D.P.R. ___ (1999), **99 J.T.S. 175,** a la página 384; *El Vocero de P.R. v. E.L.A.,* 131 D.P.R. 356, 411 (1992).

En vista de lo antes discutido y a la luz de los planteamientos de estricto derecho que el Pueblo de Puerto Rico levanta ante este Tribunal, resolvemos que tenemos jurisdicción para atender el recurso que nos ocupa. Evidentemente, decidir si el Tribunal de Primera Instancia incidió al permitir que Cotto Díaz presentara la defensa de coartada en la vista preliminar en alzada celebrada en su contra; si la posible prueba de refutación del Ministerio Público fue irrazonablemente limitada; o si el Foro recurrido desempeñó adecuadamente su función directiva a través del procedimiento en alzada, constituyen asuntos de estricto derecho discrecionalmente revisables mediante recurso de *certiorari*.

### III

La decisión que hoy emitimos requiere que profundicemos en los principios generales establecidos por nuestro ordenamiento jurídico en cuanto a la etapa de vista preliminar, vista preliminar en alzada, sus orígenes, desarrollo y consecuencias. Veamos.

La Regla 23 de Procedimiento Criminal, 32 L.P.R.A. Apéndice II, reglamenta lo concerniente a la celebración de vista preliminar.

Por otro lado, la Regla 24 (c) de Procedimiento Criminal, *supra,* establece de la siguiente manera, cuál es el procedimiento posterior a la determinación de no causa en la vista preliminar:

*"(c) Efectos de la determinación de no haber causa probable. Si luego de la vista preliminar, en los casos en que corresponda celebrar la misma, el magistrado hiciere una determinación de que no existe causa probable, el fiscal no podrá presentar acusación alguna. En tal caso o cuando la determinación fuere de que existe causa por un delito inferior al imputado, el fiscal podrá someter el asunto de nuevo con la misma o con otra prueba a un magistrado de categoría superior del Tribunal de Primera Instancia."*

Antes de entrar en vigor en el 1964, la Regla 23 de las de Procedimiento Criminal, *supra,* en Puerto Rico no existía la vista preliminar. *Pueblo v. Sánchez Vega,* 97 D.P.R. 133, 142 (1969). Mediante la misma quedó establecida la celebración de una vista preliminar en todo caso en que fuera imputado a una persona un delito grave (felony). *Pueblo v. Martínez Torres,* 116 D.P.R. 793, 801 (1986). El mandato estatutario es taxativo. *Id.* Expresamente quedó excluida toda persona imputada de delito menos grave del derecho a la vista preliminar. *Id.* La idea práctica del gran número de casos de delitos menos graves, harían sencillamente imposible la celebración de vista preliminar en esos casos. *Memoria de la Primera Sesión Plenaria, Conferencia Judicial de Puerto Rico,* Tribunal Supremo de Puerto Rico, 1958, páginas 143-144.

El procedimiento de vista preliminar ha sido objeto de amplio análisis jurisprudencial. En *Pueblo v. Martínez Torres, supra,* páginas 801, 802 (1986), el Tribunal Supremo de Puerto Rico señaló que el derecho a vista preliminar es de carácter procesal, de rango estatutario y no constitucional. Véase, *El Vocero de P.R. v. E.L.A.* 131 D.P.R. 356, 407 (1992), citando a O.E. Resumil de Sanfilippo, *Derecho Procesal Penal, Práctica Jurídica en Puerto Rico,* Equity Pub. Co., 1990, Tomo I, Capítulo 15, página 371. Esto debido a que no fue incluido en la Carta de Derechos. Véase Artículo II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico. *Id.* En *Pueblo v. Rodríguez Aponte,* 116 D.P.R. 653, 664-667 (1985), el Tribunal Supremo de Puerto Rico expuso

que la determinación de causa probable, goza, como todo dictamen judicial, de presunción legal de corrección, *Pueblo v. Tribunal Superior,* 104 D.P.R. 454, 459 (1975); *Rabell Martínez v. Tribunal Superior,* 101 D.P.R. 796, 798-799 (1973). Finalmente ha quedado resuelto que aunque el magistrado haya determinado la existencia de causa probable para acusar, el fiscal no está obligado a presentar la acusación correspondiente de así creerlo adecuado. Regla 24 de Procedimiento Criminal, *supra*; *Pueblo v. Quiñones Natal,* 94 D.P.R. 582, 584 (1967).

En *Pueblo v. Rivera Rodríguez,* 122 D.P.R. 862, 873 (1988), el Tribunal Supremo de Puerto Rico identificó dos modelos o tipos generales para enmarcar la razón de ser de la vista preliminar: visión retrospectiva (backward looking) y prospectiva (forward looking). Como este término sugiere, la preocupación primaria de la vista retrospectiva es con respecto a la legalidad del arresto y la validez de la detención. La pesquisa en la vista se manifiesta en la investigación hacia el pasado, al momento del arresto. *Id.* Está diseñada para detectar detenciones ilegales de todas clases. *Id.*, página 874. Su interés se centra en una revisión de la legalidad de la detención. *Id.* Se enfatiza el aspecto de la naturaleza preliminar no determinante ni final del procedimiento. *Id.* El procedimiento no es un juicio, sino un mecanismo inicial para cotejar la validez del arresto. *Id.* El foro de la investigación se concentra mayormente en los hechos que dieron lugar al arresto, en contraste con la posible inocencia o culpabilidad del acusado desde el punto de vista jurídico. *Id.*

El modelo de visión prospectiva se orienta hacia el futuro: el juicio. Id. El interés gira en cuanto a la probabilidad de culpabilidad o inocencia del acusado. *Id.* Se destaca una preocupación por evitar o prevenir ulteriores procedimientos innecesarios. *Id.* Por el papel central y más activo que juega el magistrado, se enfatiza su carácter más judicial, en contraste con el primer modelo señalado. Id. Puede apreciar la credibilidad de testigos y debe estar dispuesto a desestimar los cargos de estimar insuficiente la prueba presentada por el Estado. *Id.* Este último aspecto es fundamental en el modelo prospectivo. *Id.* En Puerto Rico, nuestra doctrina jurisprudencial reconoce que la vista preliminar tiene características de ambos modelos (ecléctica), aunque tímidamente tiende hacia la visión prospectiva. *Id.*

Precisamente, el modelo prospectivo resalta dentro del estudio de la naturaleza y propósito de la vista preliminar en nuestro ordenamiento jurídico. Dicha vista pretende evitar que un ciudadano sea sometido arbitraria e injustificadamente a los rigores de un procedimiento criminal, *Pueblo v. Rodríguez Aponte, supra,* a la página 663; *Pueblo v. Opio Opio, supra,* a la página 171. La misma opera en términos de probabilidades. Su función no es establecer la culpabilidad o inocencia de un acusado, sino determinar si en efecto el Estado tiene adecuada justificación para continuar con un proceso judicial. *Pueblo v. Rodríguez Aponte, supra,* páginas 663-664 (1985). La vista está encaminada a proteger a la persona imputada a través de un filtro o cedazo judicial por el cual el Estado tiene que pasar prueba, y demostrar si está justificado o no a intervenir con la libertad de un ciudadano y someterlo a los rigores, contingencias y onerosidad de un juicio plenario, *Pueblo de Puerto Rico en Interés del Menor G.R.S.,* ___ D.P.R. ___ (1999), **99 J.T.S. 122**, a la página 1434. De ahí que no exista una adjudicación final de inocencia o culpabilidad en esta etapa. *Id.* Tal determinación es realizada en un juicio. *Pueblo v. Rodríguez Aponte, supra,* a la página 660. Ahora bien, el Ministerio Público debe presentar evidencia, legalmente admisible en un juicio plenario, sobre todos los elementos del delito imputado en la denuncia y su conexión con el imputado. *Id.*, a la página 664.

## IV

Una vez el tribunal determina en la vista preliminar inicial que no existe causa probable para acusar, esta exoneración no es de carácter final, ya que *"... la determinación de causa probable no es una adjudicación de responsabilidad criminal,"* O.E. Resumil de Sanfilippo, Derecho Procesal Penal, Equity Publishing Co., 1990, Título 1 Capítulo 15, Sección 15.9, página 386. Véase, además, *Pueblo v. Vallone,* ___ D.P.R. ___ (1993), **93 J. T.S. 79,** a la página 10730. La exoneración adjudicada en la vista preliminar inicial al determinarse que no existe causa probable, no impide que el Estado pueda continuar el proceso contra el imputado. *Pueblo v. Félix Avilés,* 128 D.P.R. 468, 476 (1991). Luego de la vista preliminar inicial, existen procedimientos subsiguientes que son parte integral de la acción penal seguida contra el imputado. *Id.* Uno de estos procedimientos es la vista preliminar en alzada. *Id.*

402

Cuando el juez instructor hace una determinación de que no existe causa probable para acusar, el Ministerio Público debe informar si habrá de solicitar una vista preliminar en alzada. *Pueblo v. Méndez Pérez*, 120 D.P.R. 137, 143 (1987). El Tribunal deberá entonces advertir al imputado que el fiscal acudirá en alzada, que deberá comparecer el día señalado y que su ausencia injustificada constituirá anuencia a que la vista en alzada sea celebrada sin estar presente. *Id.* Luego de ser debidamente advertido y citado en sala, el imputado queda informado de que el procedimiento habrá de continuar en una nueva etapa y que deberá asistir a la misma. *Id.* Si el fiscal desconoce o no ha decidido solicitar una vista preliminar en alzada, entonces deberá cumplir cabalmente con las disposiciones de las Reglas 24 (c) y 235 de Procedimiento Criminal, *supra*. Esta vista no podrá ser celebrada sin que antes sea diligenciado adecuadamente la citación correspondiente. *Id.*, a la página 144.

La vista preliminar en alzada es independiente, separada y distinta a la vista inicial: no se considera una apelación. *Pueblo v. Cruz Justiniano*, 116 D.P.R. 28, 30 (1984). El derecho a juicio rápido aplica igualmente a esta etapa del proceso penal. *Pueblo v. Opio Opio, supra*, a las págs. 169-170 (1975). El Tribunal Supremo de Puerto Rico estableció que la vista preliminar en alzada debe ser celebrada dentro de un término de 60 días, contados a partir de la determinación de inexistencia de causa probable o de la determinación de causa probable por un delito menor al imputado hecha en la vista inicial. *Pueblo v. Félix Avilés, supra*, página 477. En esta nueva etapa el fiscal puede continuar su investigación y en la vista preliminar en alzada, puede presentar la misma prueba que trajo antes o puede desfilar prueba distinta si así lo cree conveniente. Regla 24 (c) de Procedimiento Criminal, *supra*. Véase, *El Vocero v. E.L.A., supra*, a la página 411. De la misma forma, la defensa puede, en virtud de que la vista preliminar en alzada en una nueva vista, separada de la primera, presentar la misma prueba u otra legalmente admisible en apoyo a su contención. *Id.*

### V

La frase *"ofrecer prueba a su favor"* apuntalada en la Regla 23 (c) de Procedimiento Criminal, *supra*, merece un análisis particular a la luz del caso de autos. La vista preliminar ha sido descrita como *"el umbral del debido proceso de ley. Hernández Ortega v. Tribunal*, 102 D.P.R. 765, 774 (1974). En ésta, el imputado tiene un surtido limitado de derechos estatutarios que le cobijan. No hay duda de que una vez incorporados ciertos derechos, por acción legislativa, éstos pasan a ser parte del debido proceso de ley. *Pueblo v. Esquilín Díaz*, ___ D.P.R. ___ (1998), **98 J.T.S. 139**, a la página 197; *Pueblo v. Prieto Maysonet*, 103 D.P.R. 102, 106 (1974).

En la primera Conferencia Judicial de Puerto Rico, el Comité de Procedimiento Criminal, por voz de su Presidente, Lcdo. Francisco Ponsa Feliú, expuso de este modo la concepción original del derecho a vista preliminar:

*"La Regla adoptada, habrán visto ustedes, está fundamentalmente inspirada, o basada, más bien, en la Regla Federal. En una Regla que, como todas las disposiciones Federales de Procedimiento Criminal, está concebida en términos generales, en términos amplios, en términos y conceptos abarcadores, sin el más mínimo esfuerzo por puntualizar o recurrir al detalle. La vista preliminar, según podemos ver de la disposición (b) de la Regla 18, y de la disposición (c) de la Regla 18, es una en la cual el acusado tendrá derecho a estar representado por abogado, tendrá derecho a repreguntar testigos contrarios y a ofrecer testigos a su favor, y la misión del magistrado será, a base de la prueba que escuche, determinar la existencia de causa probable. Concepto conocido por todos y cuyo contenido jurídico, naturalmente, las Reglas no intentan definir, puesto que lo tiene ya a base de la doctrina Jurisprudencial de existencia de causa probable. Luego, el fiscal, naturalmente, no vendrá obligado a ofrecer toda su prueba ni cosa que se parezca. Ofrecerá prueba suficiente para que, a base de esa prueba, el magistrado pueda hacer determinación afirmativa de causa probable. El Vocero v. E.L.A., supra, a las páginas 404-405, citando a Memoria de la Primera Sesión Plenaria de la Conferencia Judicial de Puerto Rico, 1958, página 144."*

Los principios antes esbozados condujeron al Tribunal Supremo de Puerto Rico a reconocer en *El Vocero v. E.L.A., supra*, a la página 409, que un imputado de delito en vista preliminar tiene derecho, limitado por la discreción del magistrado, a contrainterrogar a los testigos de cargo, incluso, a presentar prueba de defensa que derrote la probabilidad de su vinculación con el delito como autor del mismo. Al permitir que el imputado

presente prueba a su favor en la vista preliminar, éste tiene al menos dos herramientas: (1) ataca la probabilidad de que, en efecto, se haya infringido la ley; esto es, la existencia misma del delito imputado, y/o (2) demuestra que es menos probable que él haya cometido el delito; probabilidades alrededor de las cuales, precisamente, gira la determinación de causa probable para acusar. *Pueblo v. Vega Rosario,* ___ D.P.R. ____ (1999); **99 J.T.S. 114,** a la página 1346.

No obstante, la discreción del magistrado para permitir la presentación de prueba en vista preliminar no es absoluta y está limitada precisamente por la letra de la Regla 23 (c) de Procedimiento Criminal, *supra, Pueblo v. Andaluz Méndez,* ___ D.P.R. ___, **97 J.T.S. 107**, a la página 1294. En este sentido, el magistrado no puede descartar escuchar cualquier prueba que quiera aportar la defensa. *Id.* Teniendo en mente que la vista preliminar no es un mini-juicio, cuando el imputado haga un ofrecimiento de prueba que por su naturaleza demuestra en forma incontrovertida que éste no cometió el delito o que cometió un delito menor o fueron violados sus privilegios o garantías constitucionales que justifican su exoneración en esa etapa, el magistrado viene obligado a escuchar la prueba así ofrecida, siempre y cuando la misma permita disponer del caso en ese momento y no requiera resolver cuestiones de credibilidad que correspondan a la etapa del juicio. *Id.* No obstante, debemos dejar claro que el derecho de un imputado a presentar prueba a su favor, no es irrestricto y puede ser limitado de no establecer la materialidad de la evidencia favorable. *Pueblo de Puerto Rico en Interés del Menor G.R.S.,* **99 J.T. S. 122** a la página 1435. Ahora bien, si el acusado asevera que, de ser ciertos, serían pertinentes a cualquier controversia en el caso, le debe ser permitido presentar prueba a su favor. *Id.* Pero si de la oferta de prueba surge que de su faz el testimonio es inherentemente increíble, la solicitud para presentar esa prueba debe ser denegada. *Id.*

Lo anterior no significa que un magistrado no pueda aquilatar en vista preliminar asuntos de credibilidad. Sin embargo, por la naturaleza de dicha vista, la evaluación del magistrado sobre la credibilidad de los testigos, está supeditada al *quántum* de la prueba requerida en esta etapa procesal. *El Vocero de P.R. v. E.L.A., supra,* a la página 409. Si de la prueba presentada no surge la probabilidad de que se haya cometido el delito o de que el acusado probablemente lo cometió, será deber del magistrado exonerar al imputado y ordenar su libertad. *El Vocero v. E.L.A., supra,* a la página 410, citando a *Pueblo v. Félix,* 128 D.P.R. 468, (1991); *Pueblo v. Méndez Pérez,* 120 D.P.R. 137 (1987); *Pueblo v. Báez Molina,* 119 D.P.R. 315 (1991).

La jurisprudencia ha reconocído que una persona tiene derecho a levantar defensas afirmativas en vista preliminar. *Jennings v. Superior Court of Contra Costa County,* 59 Cal. Rp Transcripción 440, 449 (1967); *Jones v. Superior Court of San Bernardino County,* 4 Cal. 3d 360, 668 (1971). En *Hernández Ortega v. Tribunal Superior,* 102 D.P.R. 765, 769 (1974), el Tribunal Supremo de Puerto Rico expresó que no existía razón en nuestro ordenamiento jurídico para prohibir el planteamiento de la defensa de locura en ocasión de la vista preliminar. Cónsono con la naturaleza investigativa judicial de dicha vista, el juez no tiene que adjudicar finalmente si la defensa afirmativa prevalecerá o no eventualmente, fuera de toda duda razonable, en la vista en su fondo de estos casos. Su función es estrictamente aquilatar la razonabilidad de exponer a una persona, a quien le es imputado un delito, a los rigores de un juicio criminal. *Id.,* página 410.

De la misma forma, recientemente en *Pueblo de Puerto Rico en Interés del Menor G.R.S., supra,* a la página 1435, el Tribunal Supremo de Puerto Rico estableció que la defensa afirmativa de coartada puede ser interpuesta en la vista preliminar. Al realizar esta determinación, dicho Foro interpretó que negar a una persona su derecho a presentar testigos cuyo testimonio sea material a la determinación de inexistencia de causa probable, en una etapa tan crítica de los procedimientos criminales como lo es la vista preliminar, constituye una privación que alcanza magnitudes constitucionales por infringir la garantía que tiene todo acusado, consagrada en la Sexta Enmienda de la Constitución Federal, de tener adecuada representación legal. *Id.,* página 1437.

En cuanto a la defensa de coartada, ésta consiste esencialmente en la alegación del hecho de que el acusado no estaba en el lugar del crimen que le es imputado en la fecha y hora en que alegadamente fue cometido. *Id.,* página 1438. De manera clara, surge que el testimonio de un testigo presentado por el acusado para establecer dicha defensa, es admisible durante la vista preliminar por ser considerado material a la determinación de causa

probable. *Id.*, a las páginas 1437-1438. La defensa de coartada a ser presentada en la vista preliminar, será aquélla que, mediante evidencia clara y convincente, establezca que el testimonio prestado por los testigos de cargo, que señalan al imputado como autor de los hechos, es uno increíble, no plausible o improbable. Unicamente en esta clase de situaciones, será que el magistrado podrá considerar la credibilidad de los testigos como base para determinar que no existe causa probable para acusar, debiendo determinar causa probable en ausencia de tal evidencia clara y convincente. *Id.*, página 1438.

## VI

En estos momentos, tenemos que considerar un punto neurálgico del caso que nos ocupa. Está claro que la defensa de coartada es susceptible a ser presentada en vista preliminar. Las interrogantes que quedan en el tintero son: cómo deberá ser presentada dicha defensa y cuál es el alcance de su presentación.

La Regla 74 de Procedimiento Criminal, *supra*, en lo pertinente al caso que nos ocupa, establece que:

*"Cuando el acusado hiciere alegación de no culpable e intentare establecer la defensa de incapacidad mental en el momento de la alegada comisión del delito imputádole, o cuando su defensa fuera la de coartada, deberá presentar en el Tribunal Superior un aviso al efecto, con notificación al fiscal, dentro de los veinte (20) días siguientes al acto de lectura de la acusación en los casos en que deba celebrarse dicho acto. Cuando se hubiera entregado personalmente al acusado una copia de la acusación, el término para la presentación de estas mociones será de no más de veinte (20) días desde que el acusado hubiese respondido. Cuando no hubiese contestado, el término será de no más de veinte (20) días después de que se registre la alegación de no culpable. En el Tribunal de Distrito, el aviso con notificación al fiscal se presentará por lo menos veinte (20) días antes del juicio.*

*Si el acusado no presentare dicho aviso, no tendrá derecho a ofrecer evidencia tendente a establecer tales defensas. El tribunal podrá, sin embargo, permitir que se ofrezca dicha prueba cuando se demostrare la existencia de causa justificada para haberse omitido la presentación del aviso. En tal caso, el tribunal podrá decretar la posposición del juicio a solicitud de El Pueblo, conceder permiso para la reapertura del caso de El Pueblo, o promover cualquier otro remedio apropiado.*

*...*

*El acusado que desee establecer la defensa de coartada deberá suministrar al Ministerio Público, si este así lo solicita, la siguiente información:*

*(a) Sitio en que se encontraba el acusado a la fecha y hora de la comisión del delito.*

*(b) Desde qué hora se encontraba el acusado en ese sitio.*

*(c) Hasta qué hora estuvo el acusado en ese sitio.*

*(d) Informar qué documentos, escritos, fotografías, o papeles se propone utilizar el acusado para establecer su defensa de coartada, informando en poder de quién se encuentran.*

*El Ministerio Público tendrá la obligación recíproca de informar al acusado, si éste así lo solicita , el nombre y dirección de los testigos que se propone utilizar para refutar la defensa de coartada...".*

El Tribunal Supremo de Puerto Rico en *Pueblo v. Tribunal Superior*, 101 D.P.R. 133, discute con suma claridad los propósitos y alcance de la Regla 74 de Procedimiento Criminal, *supra*. Veamos:

*"El propósito evidente de la Regla 74 es poner al Ministerio Público en condiciones de confrontarse con una defensa de coartada o locura. Usualmente, estas defensas se presentaban en el juicio sin tiempo suficiente para*

*que el fiscal investigara los hechos, verificara la certeza de los mismos y se preparara adecuadamente para refutarlos."* Véase, Informe del Comité de Procedimiento Criminal de la Conferencia Judicial de Puerto Rico, pág. 139 (1958).

La coartada es una defensa que puede fabricarse con facilidad y de ahí la preocupación por garantizar la pureza del procedimiento judicial. La Regla 74 protege ese interés legítimo del Estado al obligar al acusado a notificar antes del juicio la intención de valerse de esta defensa. El profesor Millar, destacado propulsor de la modernización del Procedimiento Criminal en los Estados Unidos, ha explicado la necesidad del requisito de notificación en los siguientes términos:

*"No es necesario demostrar que la fabricación de la defensa de coartada es una de las avenidas que más se usan por los culpables para obtener un fallo absolutorio. Además, los delitos de perjurio que se cometen anualmente, conectados con la defensa de coartada, son parte considerable de los crímenes que escapan sin que se procesen a los responsables. El perjurio podría corroborarse y se haría más difícil la fabricación de la defensa exigiéndole al acusado notificar al fiscal que intenta valerse de la misma para que éste pueda confirmarla o refutarla. Así es la práctica en Escocia, en donde no se le permite al acusado usar la defensa de coartada a menos que la alegue afirmativamente. Al así hacerlo, debe de especificar el lugar en donde supuestamente se encontraba al momento del crimen. Millar: The Modernization of Criminal Procedure, 11 J. Crim. L. & C. 350."*

El requisito de notificación se apoya en sólidas y convincentes razones de orden procesal. Elimina el elemento de sorpresa y ocultación en el juicio que entorpece la búsqueda de la verdad. Desalienta la fabricación de la defensa de coartada porque el acusado sabe de antemano que el fiscal investigará la información falsa que le suministre. Acelera los procedimientos en beneficio de una justicia rápida y económica, ya que si, investigada la coartada, el fiscal se convence de la veracidad de la defensa, puede pedir la desestimación de la acusación; y, de todas maneras, tiene la oportunidad de prepararse para el juicio sin necesidad de pedir posposiciones. La notificación al fiscal establece ciertas garantías mínimas contra el fraude y la fabricación de prueba reduciendo así el aspecto peyorativo de la defensa de coartada. El requisito de notificación se considera un elemento muy importante en el contexto de un esquema liberal de descubrimiento de prueba. Véase Epstein, *Advance Notice of Alibi*, 55 J. Crim. Law C. & P. S. 29, 31 (1934). Louisell, *Criminal Discovery & Self Incriminations: Roger Traynor Confronts the Dilemma;* Brenson, *Remarks on Discovery,* 33 F.R.D. 56; *Developments in the Law Discovery,* 74 Harv. L. Rev. 840, 1051, 1063; *State Allows Pre Trial Discovery Against Defendant Who Raises Affirmative Defense,* Comentario, 76 Harv. L. Rev. 838, 832.

Históricamente, ha sido interpretado que la Regla 74 de Procedimiento Criminal, *supra*, consagra al ministerio público un medio de descubrimiento de prueba. *Pueblo v. Tribunal Superior,* 99 D.P.R. 98, 102 (1970). Sin embargo, el alcance del descubrimiento autorizado por esta regla está delimitado a que el acusado [o imputado, según sea el caso] suministre al ministerio público la información que la propia regla requiere. Una vez identificados los testigos del acusado [o imputado] por sus nombres y direcciones, el fiscal estará en condiciones de practicar una amplia investigación sobre dichos testigos. *Id.*, páginas 102-103. El fiscal puede determinar mediante esa investigación y del examen de terceras personas o documentos, si los testigos de la coartada estaban realmente presentes en el sitio donde alega el acusado [o imputado] estaba en el momento de la comisión del delito; y de obtenerla, presentar prueba para contradecir a dichos testigos. *Id.*, página 103. El paradero de una persona en determinado día y hora puede ser descubierto mediante el testimonio de otras personas o de evidencia documental. *Id.* Sin embargo, el Tribunal Supremo de Puerto Rico ha interpretado que un fiscal no puede citar y examinar bajo juramento a testigos del acusado en la etapa de investigación de un delito, Artículo 11 del Código de Enjuiciamiento Criminal, 34 L.P.R.A. Sección 11. Véase, *Pueblo v. Tribunal Superior, supra*, a la página 104. Es decir que el Ministerio Público no puede examinar bajo juramento los testigos de coartada de un acusado, excepto en el acto de juicio público. *Id.*

De la misma forma, ha quedado establecido que existe una obligación recíproca de informar la prueba que habrá de ser utilizada para refutar la defensa de coartada. En *Pueblo v. Tribunal Superior,* 101 D.P.R. 133, 138

(1973), el Tribunal Supremo de Puerto Rico dispuso que la misma es esencial para preservar el *"balance que garantiza [el cumplimiento con] las exigencias del debido procedimiento de ley y del juicio justo,"*. *Id.* Sin embargo, en *Pueblo v. Acosta Acosta,* 107 D.P.R. 68, 69-70 (1978), quedó aclarado que dicha obligación sólo surge, una vez el acusado reclama su derecho a obtener información relativa a la prueba de refutación de coartada. *Id.,* a la página 70. Véase, III Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos,* Sección 27.7, a las páginas 308.09 (1993). Ello en nada coarta el derecho del acusado a obtener información relativa a la coartada. *Pueblo v. Rosario Reyes,* ___ D.P.R. ___ (1995), **95 J.T.S. 74,** a la página 942. Esta exigencia simplemente obliga a la defensa a actuar diligentemente al solicitarle al Ministerio que le facilite dicha información en lugar de esperar que la misma aparezca. *Id.* Ello resulta lógico, puesto que el acusado que notifica sobre su intención de servirse de la defensa de coartada tiene que presumir que el Ministerio Público va a investigar cuán sólida es dicha defensa para refutarla en su día. *Id.*

En *Pueblo v. Lebrón Lebrón,* 116 D.P.R. 855, 859 (1986), el Tribunal Supremo de Puerto Rico expresó, en cuanto al planteamiento de locura en vista preliminar, que en tales casos, el Ministerio Público tendrá a su favor el beneficio de lo dispuesto en la Regla 74 de Procedimiento Criminal, *supra.* Por analogía, este principio es de aplicación a los casos en que un imputado de delito interese presentar la defensa de coartada en vista preliminar. Sin embargo, la Regla 74 de Procedimiento Criminal, *supra,* fue diseñada con el propósito de dar la oportunidad al Ministerio Público de conocer sobre la intención de una persona de levantar la defensa de coartada en al acto del juicio. Dicha Regla guarda silencio en torno a su presentación en vista preliminar. No obstante, sabido es que como parte del carácter adversativo que distingue nuestro sistema de justicia, los tribunales pueden ejercer su facultad inherente para ordenar la producción de evidencia necesaria y relevante para la defensa o para el Ministerio Público. *United States v. Nobles,* 422 U.S. 225, 229 (1975). Es decir, los tribunales, en el ejercicio de su discreción, tienen amplia autoridad para proveer para el descubrimiento de prueba, aun en ausencia de un mandato constitucional o legislación habilitadora. *Efraín Meléndez, Fiscal Especial Independiente,* ___ D.P.R. ___ (1994), **94 J.T.S. 42,** a la página 11731; *Wynn Millard v. The Superior Court of San Diego County,* 182 Cal. App. 3d 471, 475 (1986); *United States v. Nobles, supra,* a la página 237.

Este poder propio de la función judicial no es absoluto y es inapropiado ejercitar el mismo de forma conflictiva con la Constitución Federal y la de Puerto Rico o con la legislación promulgada al respecto. Conforme a ello, en *Frattallone Di Gangi v. Tribunal Superior,* 94 D.P.R. 104, 115 (1997), el Tribunal Supremo de Puerto Rico expresó que *"el fiscal puede conducir su investigación en la forma que estime apropiada dentro del marco que define la ley, siempre que no se lesionen los derechos de los testigos y los presuntos acusados."*

En lo relevante a la etapa de vista preliminar, debemos recordar que ésta no es un mini juicio, allí no queda adjudicada la responsabilidad. Como hemos dicho antes, su función es verificar si están presentes los elementos del delito y su relación con el imputado. Con esta visión, el magistrado debe analizar si de la totalidad de la prueba ante sí, el debido proceso de ley permite que una persona sea sometida a los rigores y consecuencias de un proceso penal. Si un imputado, para derrotar su relación con el delito, quiere levantar una defensa afirmativa en vista preliminar, le está permitido. Ahora bien, las partes deben tener derecho a descubrir prueba. *Dunlap Holman v. The Superior Court of Moterrey County,* 29 Cal. 3d. 480, 484 (1981). El alcance de este descubrimiento debe ser regido por los principios generales de la Regla 74 de Procedimiento Criminal, *supra,* sin perder de vista que el Tribunal de Primera Instancia puede hacer uso de su discreción de acuerdo a los objetivos que la vista preliminar persigue y sin que sean menoscabados los derechos del imputado.

## VII

En el caso de autos es imprescindible recalcar que de la transcripción de la prueba ante nos, en ningún momento surge que el Ministerio Público objetara la presentación de la prueba de coartada en la vista preliminar en alzada. En esta etapa, es por primera vez que el Procurador General plantea que el Tribunal de Primera Instancia erró al permitir que Cotto Díaz presentara la defensa de coartada en vista preliminar en alzada sin antes cumplir con lo establecido en la Regla 74 de Procedimiento Criminal, *supra.* Normalmente, dicho planteamiento no debería prosperar. *Rivera Rivera v. Jefe de Penitenciaría,* 99 D.P.R. 81, 83 (1970); *Pueblo v. Del Valle,* 91 D. P.R. 174, 179 (1964). Sin embargo, la norma antes expuesta no es un dogma inquebrantable. *Sánchez v. Eastern*

*Air Lines, Inc.,* 114 D.P.R. 691, 695 (1983). Su existencia es incompatible con la exigencia de fallar los casos en sus méritos. *Id.* Por esta razón, y a manera de excepción, procedemos a discutir el error planteado.

Bajo los hechos particulares que presenta el caso de autos, el Tribunal de Primera Instancia aceptó que Cotto Díaz cumpliera con la notificación formal establecida en la Regla 74 de Procedimiento Criminal, *supra*, luego de comenzar la vista preliminar en alzada. Está claro que nuestro ordenamiento jurídico acepta que la defensa de coartada sea levantada en vista preliminar. En dicho caso, la jurisprudencia ha interpretado que el Ministerio Público tendrá a su beneficio lo establecido en la Regla 74 de Procedimiento Criminal. Sin embargo, este beneficio debe quedar inevitablemente atado a los fines que persigue la etapa de vista preliminar.

Un imputado debe notificar al Ministerio Público, por lo menos 20 días antes de la celebración de la vista preliminar o la vista preliminar en alzada, su intención de utilizar la defensa de coartada en esta etapa de los procedimientos. Dicha notificación debe cumplir estrictamente con lo establecido en la Regla 74 de Procedimiento Criminal, *supra*. No obstante, esta norma debe ser interpretada flexiblemente. Si el Tribunal de Primera Instancia, en el ejercicio de su discreción, queda convencido de que, aun cuando el imputado no cumpliera con la notificación requerida, su ofrecimiento de prueba es lo suficientemente fuerte como para que no deba continuar con el procedimiento criminal, el Foro de Primera Instancia ordenará al imputado cumplir con la notificación antes mencionada y suspenderá los procedimientos para que el Ministerio Público pueda investigar lo alegado.

En el caso ante nos, el Tribunal de Primera Instancia consideró la fuerte posibilidad de que ante un planteamiento de coartada, resultaría innecesario someter a Cotto Díaz a un juicio. Por esta razón, dicho Foro aceptó que Cotto Díaz cumpliera con la notificación formal establecida en la Regla 74 de Procedimiento Criminal, *supra*, después de haber comenzado la vista preliminar en alzada. El Tribunal de Primera Instancia, en todo momento, estuvo en disposición de otorgar al Ministerio Público tiempo suficiente para analizar la coartada y descubrir prueba de refutación.

El propio Ministerio Público, en vez de objetar la presentación de la defensa de coartada, solicitó un reducido término de 10 días para estar preparado para investigar la misma y proceder con la continuación de los trabajos. El Tribunal de Primera Instancia recomendó que la vista continuara el 1 de septiembre de 1999, pero el Ministerio Público solicitó que los procedimientos continuaran el 30 de agosto del mismo año debido a un juicio que en esos días tenía señalado. Del expediente ante nuestra consideración, surge que el Ministerio Público tuvo oportunidad suficiente para investigar la defensa de coartada. De esta forma, el primer error no fue cometido.

Lo antes señalado nos conduce a discutir el segundo error que el Procurador General imputa al Tribunal de Primera Instancia. A saber, si dicho Foro irrazonablemente limitó la oportunidad del Ministerio Público de descubrir prueba para refutar la defensa presentada por Cotto Díaz al no permitir que fueran sometidos a pruebas periciales el original del video y las fotos que pretendía utilizar el imputado como parte de su prueba de coartada. El Procurador General argumenta que dicha prueba resulta ser un *"testigo silente"*, cuya declaración, de no ser auténtica, derrumbaría la prueba de coartada presentada por Cotto Díaz. No le asiste la razón.

Ante un planteamiento de coartada, como hemos dicho antes, el Tribunal, en el ejercicio de su discreción, puede permitir al Ministerio Público realizar descubrimiento de prueba acorde con los principios establecidos en las Reglas 23 y 74 de Procedimiento Criminal, *supra*.

El concepto discreción significa tener poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción. En el ámbito judicial, sin embargo, el mencionado concepto *"no significa poder actuar en una u otra forma, haciendo abstracción del resto del Derecho...". Pueblo v. Ortega Santiago,* 125 D.P.R. 203, 211 (1990). El adecuado ejercicio de la discreción judicial es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera. *In re: Chaves Ghiglioty,* ___ D.P.R. ___ (1997), **97 J.T.S. 152**, a la página 444.

El abuso de discreción puede surgir de varias maneras en el ámbito judicial. Ello sucede cuando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto. También sucede cuando, por el contrario, el juez, sin justificación alguna y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos. *Pueblo v. Ortega Santiago, supra*, páginas 211-212.

En el caso de marras, el Tribunal de Primera Instancia no abusó de su discreción al autorizar a Cotto Díaz presentar la defensa de coartada en la vista preliminar en alzada. El error imputado estriba en no haber permitido, finalmente, instancia la realización de pruebas periciales al video y a las fotos. El argumento del Procurador General está fundamentado en la teoría del testigo silente. Dicha doctrina versa sobre la forma de admitir una pieza ofrecida en evidencia. Esto es, en vez de utilizar un testigo que declare acerca de la escena demostrada en la foto o video, su admisión depende de otra evidencia que apoye la autenticidad de lo demostrado. *McCormick on Evidence,* Section 214 (West Hornbook Series 1992). La antes mencionada doctrina es utilizada para verificar el proceso científico mediante el cual es obtenida la pieza que pretende ser admitida en evidencia. *Id.* No obstante, en el caso de autos, el video nunca fue utilizado por Cotto Díaz para probar la coartada. Por lo tanto, no constituye una pieza cuya autenticidad deba ser corroborada. Además, la solicitud del Ministerio Público descansa en meras especulaciones sin concreción alguna.

En cuanto a las fotos admitidas en evidencia, aun cuando dicha admisión resultare errónea, ello no es suficiente para revocar la determinación tomada por el Tribunal de Primera Instancia. Para que ello ocurra. es necesario que la admisión de una pieza evidenciaria sea un factor decisivo o sustancial en el resultado del caso *Pueblo v. Ruiz Bosh,* 127 D.P.R. 762, 781-782 (1991); *Pueblo v. Fradera Olmo,* 122 D.P.R. 67, 78 (1988). Esta no es la situación que nos ocupa. Aunque cuando las fotos en evidencia hubieran sido admitidas erróneamente, la prueba de coartada en este caso es clara y convincente. Ello surge de las declaraciones de los testigos que Cotto Díaz presentó, los cuales no fueron refutados. Si a ello unimos que la prueba de cargo estuvo llena de contradicciones y relatos incompletos, además de carecer de fuerza, debemos concluir que no erró el Tribunal de Primera Instancia al apreciar la prueba ante sí y, por ende, determinar que no existía causa probable para acusar a Cotto Díaz. ■

La contención del Ministerio Público descansa en que apliquemos con todo su rigor la Regla 74 de Procedimiento Criminal, *supra,* a los procedimientos de vista preliminar. Si adoptáramos su teoría, la naturaleza de la vista preliminar cambiaría radicalmente para convertirla en un juicio en su fondo. Lo ideal es que el anuncio sobre la defensa de coartada sea formalmente hecho por los menos 20 días antes de la celebración de la vista preliminar. Pero si tomamos en cuenta que en el caso de autos, el Ministerio Público no levantó su planteamiento oportunamente ante el Foro de Primera Instancia y lo unimos al hecho de que dicho Foro dio razonable oportunidad para que el Ministerio Público estuviera preparado, debemos concluir que el Tribunal de Primera Instancia no erró en ese sentido.

Por otro lado, surge del expediente de autos que luego de examinar la notificación relacionada a la prueba de coartada que Cotto Díaz utilizaría, el Ministerio Público decidió entrevistar a los testigos del imputado y examinar la prueba documental que éste utilizaría. Posteriormente, el Ministerio Público solicitó al Tribunal de Primera Instancia someter a exámenes periciales los originales de la prueba documental a ser utilizada por el imputado. Dicho Foro, en el ejercicio de su discreción, lo permitió. El Ministerio Público entrevistó a ocho testigos de Cotto Díaz, pero no logró realizar las pruebas periciales a las que deseaba someter el original del video y las fotos que pretendía utilizar Cotto Díaz antes de la fecha provista para que continuara la vista preliminar en alzada. En atención a lo anterior, el Ministerio Público solicitó la transferencia de la continuación de los procedimientos. El Foro de Primera Instancia no asintió a dicha solicitud. Al terminar la vista, el Ministerio Público solicitó tiempo para realizar las pruebas, toda vez que su única evidencia de refutación dependía de los resultados periciales. El Tribunal de Primera Instancia no concedió lo solicitado.

Lo antes descrito debe ser analizado nuevamente a la luz de la posibilidad de abuso de discreción por parte del Foro de Primera Instancia, y vista la totalidad de la prueba admitida en evidencia. Ante nuestra consideración yacen las mismas interrogantes que tuvo el Juez que presidió los procedimientos en el Tribunal de Primera Instancia con relación a la debilidad de la prueba presentada por el Ministerio Público. Además, los testimonios de los testigos de coartada, sin lugar a duda cumplieron cabalmente con el requisito de probar de manera clara y convincente que Cotto Díaz no estaba el 20 de noviembre de 1998 en el lugar y hora donde fue efectuada la transacción ilegal en la cual le es imputado haber participado. Lo anterior nos lleva a concluir que el Tribunal de Primera Instancia no abusó de su discreción al denegar la petición del Ministerio Público en torno a las pruebas periciales solicitadas. El planteamiento del Ministerio Público raya en la especulación y fomenta el continuar sometiendo a una persona injustificadamente al rigor de un proceso penal en contra de los propósitos que persigue la celebración de vista preliminar.

Finalmente, el Ministerio Público argumenta que el Tribunal de Primera Instancia asumió un rol más activo del permitido en nuestro ordenamiento jurídico. Tampoco le asiste la razón.

Los jueces tienen el deber de cumplir cabalmente con el precepto moral y ético de que en *"...todo momento y por sobre toda otra consideración, sus actuaciones han de auspiciar el descubrimiento de la verdad como base esencial para impartir la justicia que de él se espera."* Este deber emana de una obligación que trasciende la concepción arcaica y desacreditada de que un juez es un mero espectador de la pugna judicial, comparable al inexpresivo rostro del jugador de cartas (pocker face). *Urrutia v. A.A.A.*, 103 D.P.R. 643, 651-652 (1975). El Juez o la Jueza deberá intervenir durante el curso de cualquier procedimiento judicial para evitar dilaciones injustificadas y para esclarecer cualquier extremo o impedir una injusticia. Este o ésta tendrá siempre presente que no es un simple árbitro o árbitra o el retraído moderador de un debate, sino que es partícipe y actor principal en el esclarecimiento de la verdad y en la determinación de lo que es justo, y puede, con mayor libertad en casos celebrados sin jurado, ser participante activo o activa en la búsqueda de la verdad, siempre que no vulnere la imparcialidad que su alto oficio reclama. No obstante, se abstendrá de unirse en solidaridad con cualesquiera de las partes mediante interrogatorios injustificados, pronunciamientos sobre los méritos de la causa o comentarios impropios o perjudiciales. *In Re: Enmiendas a los Cánones de Etica Judicial*, ___ D.P.R. ___ (1999), **99 J.T. S. 176,** a la página 399. Esto no significa que, con el propósito de evitar un desvarío de la justicia y como parte del poder inherente que poseen los tribunales, el magistrado que preside los procedimientos esté impedido de requerir la declaración de determinado testigo en situaciones en que el testimonio de dicha persona pueda ayudar a esclarecer la verdad y a que se haga justicia. En especial, cuando el procedimiento de vista preliminar debe ser uno flexible respecto a las etiquetas de testigo *"de cargo"* o *"de defensa"*. *Pueblo v. Vega Rosario, supra,* a la página 1348.

En el caso que nos ocupa, el Juez que presidió los procedimientos cumplió a cabalidad con su función de descubrir la verdad. El rol activo que todo juez debe asumir, no debe ser confundido con parcialidad.

No hay indicios de que el Tribunal de Primera Instancia haya actuado de forma solidaria, irrazonable o prejuiciada a favor o en contra de cualquiera de las partes. El que un testigo en esta etapa hubiere sido llamado a declarar por el Tribunal, está dentro de sus prerrogativas. Tampoco hay indicios que muestren que los comentarios hechos sobre la investigación realizada contra Cotto Díaz hayan sido impropios. Meramente, fueron parte del proceso de aquilatar la prueba que realizó el Foro de Instancia.

## VIII

Por los fundamentos antes expuestos, procedemos a EXPEDIR el auto solicitado y CONFIRMAR la determinación recurrida.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General